266 So.2d 637

Earl FLANNAGIN

v.

STATE.

8 Div. 44.

Court of Criminal Appeals of Alabama.

Oct. 5, 1971.

Rehearing Denied Nov. 23, 1971.

Robert Straub, Decatur, Charles E. Carmichael, Tuscumbia, for appellant.

MacDonald Gallion, Atty. Gen., and Joseph Victor Price, Jr., Asst. Atty. Gen., for the State.

CATES, Judge.

Murder, first degree: sentence, electrocution.

### I.

We have examined the applicability of Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433, and conclude that the five veniremen challenged by the State exhibited an irrevocable commitment to vote against capital punishment. There is no error in the ruling below.

### II

Over objection the victim's pocketknife and bloody shirt were allowed in evidence.

On appeal error is claimed because of irrelevance. If the victim was wearing the shirt when Flannagin shot him, there, in all probability, would have been a hole in the shirt. Otherwise it was a piece of cloth into which, somehow, the blood soaked. Boyette v. State, 215 Ala. 472, 110 So. 812.

The witness who identified the knife described finding it in the victim's pocket unopened.

On Sunday morning, June 8, 1969 a neighbor came to the roadside · store of Louis Robert Lane. The door stood open and a television could be heard from the Lanes' living quarters in the rear. Looking in, the visitor saw Lane upright on a couch with two bullet holes in his head. An autopsy disclosed a third wound in the right chest area.

The State's two principal witnesses as to the finding of Lane on the couch were a neighbor, Ray Little, and an ambulance driver, Fred Gillespie.

Little testified that Lane "had on his shirt but it was unbottoned like he was getting ready for bed." Gillespie was not interrogated about Lane's shirt.

In the course of the testimony of the State's witness, Harvey K. Elliott, Jr., the coroner, over objection the court allowed the deceased's bloody shirt to come into evidence (R. 348).

The examination of Elliott on this point appears in the record before us as follows:

Q. The sack that had his clothing in it has now been opened?

A. Yes, sir.

Q. I will ask you if you didn't open that during the noon recess in the Judge's Chambers in the presence of Mr. Miller and Mr. Proctor, the lawyers for the defendant, and in the presence of the Court, the Honorable Billy Burney, and me?

A. Yes, sir.

Q. Among the clothing in that paper was a cap that Mr. Lane had on?

A. Yes, sir.

\* \* \* \* \* \*

Q. Did you personally remove them or were they removed in your presence?

A. I personally removed the clothing, sir.

Q. And you have had them in your possession continuously since then?

A. Yes, sir.

Q. None of them have been washed and in the same condition as they were then?

A. Yes, sir.

Q. Except that they have been wadded up in that paper sack there?

A. I kept them in that bag for safe keeping, yes, sir.

Q. Now, what articles of clothing did you remove that you have in that sack?

A. I have his cap, a black baseball type of cap, a shirt, a pair of men's shorts, a pair of trousers, a pair of shoes, and a pair of socks.

Q. Do you—maybe I can ask this. If it's wrong, why—The shirt in there is the same shirt that Mr. Lane has on in the picture that is marked Exhibit 1 and 2?

A. Yes, sir.

Q. The trousers are the same trousers?

A. Yes, sir.

Q. The shoes are the same shoes?

A. Yes, sir.

Q. The cap is the same cap?

A. Yes, sir.

Q. The only thing that isn't shown in that picture, then, or in one or both of those pictures, marked State's Exhibit 1 and 2, would be his shorts and maybe his socks and they are not visible there?

A. That's right, sir.

\* \* \* \* \* \*

BY MR. PETTUS:

Q. When you found his shirt, did he have an undershirt on or anything underneath his shirt?

A. No, sir.

Q. All right. What was the condition of that shirt at the time that you first examined it?

MR. PROCTOR: We object.

MR. MILLER: Now, we object.

THE COURT: Well, let's—if you are going to offer them, let's have them identified.

MR. PETTUS: All right, sir. If I had asked the other way I think they would have said I was leading. We would like to identify the shirt as State's Exhibit No. 5.

( Whereupon the article above re-
( ferred to was marked for identifi-
( cation as State's Exhibit No. 5.

MR. PETTUS: Leave it in there, if you will, until I can ask a few more questions.

Q. You say that that shirt is in the same condition now that it was in when you first found it?

A. Yes, sir.

Q. And took it off?

A. Yes, sir.

Q. Is there any difference in the condition of that shirt now and when you first took it off, and if so, what would be that difference?

A. The shirt was folded up and placed in the bag and it's in a crinkled condition now.

Q. What was the condition of the blood on that shirt when you first found it?

MR. MILLER: We object, if the Court please.

THE COURT: On what grounds?

MR. MILLER: On the grounds that the question was, what was the condition of the blood, would be highly immaterial, inflammatory and prejudicial to this defendant. The shirt itself would be the best evidence.

THE COURT: Well, then, it's admissible, but just get through the preliminary questions and let him testify what he observed down there at the scene and all about the clothing. I will admit it for the purposes that I stated to you earlier.

MR. PETTUS: All right.

Q. Would you describe the clothing that you found and that you saw at the scene?

A. The shirt was bloody—

Q. Bloody. Where was the blood on the shirt?

A. On the right side of his shirt in the—below the pocket or in a pocket position of the shirt and on the coat tail of the shirt and some blood on the left shoulder.

Q. Was it in that condition when you first saw it?

A. Yes, sir.

Q. Was the blood wet or dry when you first saw it?

A. Portions of the blood was dry and some of it was still wet.

Q. What portion was dry and what portion was still wet?

A. Blood on the left shoulder was dry and the blood down the coat tail part of the shirt was wet.

Q. Describe to the jury the accumulation of blood where it was dry on the left shoulder, the accumulation of blood where it was still wet?

A. The accumulation on the shoulder was not of large quantity of blood; the blood on the coat tail and the right

side of his shirt was a large area covering the majority of the shirt in that area.

Q. Now, with the exception of the fact that that portion of that blood that was still wet is now dry. I presume?

A. Yes, sir.

Q. Is the shirt in the same condition as it was at that time?

A. Yes, sir.

MR. PETTUS: We offer it in evidence. We offer the shirt in evidence as State's Exhibit 5.

MR. PROCTOR: Now, we object, Your Honor, on the grounds that it sheds no light on the issues in this case, that it's highly prejudicial to the defendant, further on the grounds that it's inflammatory and accumulative.

THE COURT: I am going to admit it for the purpose for whatever weight it might be, what light it could possibly shed on as to the time that Mr. Lane sustained these wounds, but for no other purposes. That is the purpose that the Court is admitting it into evidence.

MR. PROCTOR: We reserve an exception.

( Whereupon State's Exhibit No. 5,
( having previously been marked for
( identification was received in evi-
( dence.

Under Supreme Court Rule 51 we ordered State's Exhibit No. 5 sent up for our examination. It is blood stained and has a hole about ⅛ of an inch in diameter located ½ of an inch above the right front breast pocket. It bears out witness Little's testimony that Lane had it unfastened and open and the testimony of the toxicologist that there was no exit of the bullet which made the chest wounds. A photograph (State's Exch. 2) showed Lane on the couch. He had the shirt on. Blood was below the top of the shirt pocket.

█ There being no limitation of prosecution of murder (Code 1940, T. 15, § 219) time of the killing is not material except where the deceased may have lived beyond the common law year and a day after his wounding. Also, Code 1940, T. 15, § 237 obviates the need to lay the precise time of an offense save where time is a material ingredient.

Under the instant record there was no controversy as to when (as might occur under a defense of alibi) Flannagin killed Lane. Indeed, the defense offered no witnesses.

No expert testimony was offered as to the clotting time of human blood nor of Lane's coagulative factor. Exsanguination as an observable circumstance, e. g., spurting blood or a heart empty of blood, can furnish, in some instances, comparative times of death of those in common disasters.

But even after clinical (or cerebral) death the heart can by reflex continue to pump blood. This evidence of circulation tends to negate "legal" death. In re Estate of Schmidt, 261 Cal.App.2d 262, 67 Cal.Rptr. 847; Corday, Death in Human Transplantation, 55 A.B.A.J. 629. See also Broome v. Duncan, Miss., 29 So. 394; Schmitt v. Pierce, Mo., 344 S.W.2d 120; Sauers v. Stolz, 121 Colo. 456, 218 P.2d 741.

Accordingly, having thus concluded that the blood on the shirt had no material tendency to shed light on the time of Lane's death and that time was not material within the issues of the trial, we next examine into the effect of the admission of the bloodstained shirt as evidence.

█ Clothing of the deceased is generally admissible in homicide trials, subject, of course, to the common evidentiary condition that it must tend to shed light on some point within the issues in the case. This is valid even though the articles are in a gruesome or repulsive condition.

Grissett v. State, 241 Ala. 343, 2 So.2d 399. Even a stipulation by the defense does not avail in Alabama to keep the prosecution from adducing gruesome objects in proof so long as they are relevant. Powell v. State, 40 Ala.App. 148, 109 So.2d 525. Nor is relevancy affected by the cumulative nature of the deccased's clothing as proof. Weems v. State, 222 Ala. 346, 132 So. 711; Hyche v. State, 217 Ala. 114, 114 So. 906.

■ Ordinarily clothing which has no illuminative tendency carries no disparagement of the defense. Hence, its admission in evidence may make the trial tedious, but in law it is swept up in the doctrine of error without injury.

However, in Boyette v. State, 215 Ala. 472, 110 So. 812, we find per Anderson, C. J.:

"The trial court should not have permitted the introduction of the clothing of the deceased, as it shed no light whatever upon any material inquiry in the case, and was but the presentation of an unsightly spectacle calculated to prejudice the jury. There was no dispute as to the location of the wounds or the character of same on or about the head, and the bloody clothing of the deceased shed no light upon any controverted fact. The clothes worn by the deceased should never be offered in evidence unless they 'have some tendency to shed light upon some material inquiry.' * * *"

In that case the deceased was shot in the head and blood had dripped onto his shirt.

While there are many cases wherein the courts have distinguished Boyette, supra, we find none which expressly or impliedly overrules it. We have gone to the appellate records in Weems v. State, 24 Ala.App. 210, 132 So. 709 and Teague v. State, 245 Ala. 339, 16 So.2d 877.

In *Weems,* supra, there was unquestionably a bullet hole in Lockwood's shirt.

Foster, J., in Weems v. State, 222 Ala. 346, 132 So. 711 wrote:

"In the case of Hyche v. State, 22 Ala. App. 176, 113 So. 644, the Court of Appeals differentiated the facts from those pointed out in Boyette v. State, 215 Ala. 472, 110 So. 812, pertaining to the admissibility of clothes worn by deceased at the time he was killed. This distinction was approved by this court on certiorari (Hyche v. State, 217 Ala. 114, 114 So. 906). If the clothes do not show the location of the shot which killed him or illustrate the nature of the occurrence or some fact material to the issue, they are said not to be admissible. In the Boyette Case they did not show any such conditions. In that case, deceased was shot in the head, and the clothes therefore had no bullet holes, or other marks, except blood stains. In the Hyche Case, the clothes did show the location of the bullet hole, and were held to be properly admitted as shedding light upon the character and location of the wound on the body, though it was merely cumulative evidence, and there was no dispute. It was a circumstance, material, if cumulative. The admission of cumulative evidence, even upon a fact not disputed, is not prejudicial error. It is our judgment that there was no reversible error in admitting the shirt in evidence, on account of the matters discussed in the opinion of the Court of Appeals."

■ Having examined the bloody shirt en banc, we consider that the hole was sufficiently large (approximately the same diameter as the .22 cal pistol used) to have permitted the jury to infer that a bullet could have made the hole in question.

It requires no citation to support the proposition that if any sufficient reason will uphold a lower court's ruling then it will be affirmed on appeal even though the trial judge might give a different one.

Hence, on authority of *Hyche,* supra, we distinguish *Boyette,* supra, and find no

error in overruling the defendant's objection to the admission of the deceased's shirt.

### III

At pages 452–453 of the instant record defense counsel made a motion that a certain tape recording of a confession be played outside the jury's hearing and be transcribed by the court reporter. This motion was overruled by the trial judge.

On appeal appellant claims error. However, the recording had beforehand been played "in the Court's presence." (R. 447).

We consider the reference in Wright v. State, 38 Ala.App. 64, 79 So.2d 66 (h. n. 7) as to making a transcription was, in this case, inapplicable because the recorded confession was cumulative of (1) a typed confession signed by the defendant and (2) testimony of witnesses to his inculpatory statements. In all instances the proper predicates were shown.

### IV

The fourth claim of error is said to arise from an alleged failure of the officers to advise Flannagin, in addition to the other warnings under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694, that he could at any time stop answering and ask for a lawyer.

Strictly, as we read Miranda, this is not one of the decreed warnings: rather it is a part of the subsequent procedure, i. e., a point at which further interrogation must cease. We find no error.

### V

Under § 10, Act 249, June 24, 1943 we have reviewed the entire record and consider that the judgment of the circuit court is due to be

Affirmed.