Appellant was indicted for murder in the first degree, found guilty of manslaughter in the first degree and sentenced to ten years imprisonment, in accordance with the punishment fixed by the jury. He had pleaded not guilty and not guilty by reason of insanity.
Good fortune seldom shone bright upon les miserables
constituting the principal characters of the tragedy presented by this case. Defendant had been married to the victim, Carol Ann Smith, about thirteen years. She divorced him on July 19, 1976, but they continued to live together as man and wife for about six weeks thereafter.
In the latter part of August, Carol Ann left defendant and went to Macon, Georgia, where she was living with another man. Defendant longed for her, found out where she was living and went and persuaded her to return to live with him, but soon thereafter Carol Ann left him again and moved into a trailer with the same man with whom she had lived in Macon, Georgia. On November 18, 1976, she called defendant and agreed to come back to him the next day. She did not return, and defendant went to find her to determine "what the problem was." He went to the trailer occupied by the other man, asked him where Carol Ann was, and he refused to tell him. Defendant pulled his knife out of his pocket and the other man ran out of the trailer. Defendant returned to the trailer where he found Carol Ann in a closet. He began to hit her with the knife in his hand. Upon seeing the blood flowing from the stab wounds in her midsection, he picked her up and carried her to his car and then to the hospital, and checked her in. He then went back to his car, called a lawyer, and on his way to see a lawyer, threw the knife in the river. Carol Ann died on December 23, 1976.
But for the question raised by defendant on the trial, and by appellant at this time, to the effect that the stabbing of Carol Ann by defendant was not shown by the evidence to have been the cause of her death, no question is raised as to the sufficiency of the evidence to support the verdict of manslaughter in the first degree. It is clear that no such question can be seriously raised, for it is obvious that the jury was persuaded to reduce the degree of homicide charged in the indictment to manslaughter in the first degree by reason of principles of law given to the jury by the trial court in its oral charge, and in written instructions, relative to the preclusion of malice at times by the natural passion engendered when one discovers his wife in an act of adultery. Without indicating any agreement with the finding of the jury on the point, we note that the trial court submitted to the jury the question whether the status of the two was that of a common law marriage at the time and fully instructed the jury as to the circumstances when a reduction to manslaughter would, and when it would not, be warranted, in accordance with such cases asLogan v. State, 155 Ala. 85, 46 So. 480; Brunson v. State,212 Ala. 571, 103 So. 664; Sheppard v. State, 243 Ala. 498,10 So.2d 822; Palmore v. State, 253 Ala. 183, 43 So.2d 399;Palmore v. State, 283 Ala. 501, 218 So.2d 830; Farr v. State,54 Ala. App. 80, 304 So.2d 898.
Appellant is correct in the position taken by him that proof as to the cause of the death of Carol Ann Smith must follow the charge in the indictment that defendant killed her "by stabbing her with a knife." In contending that it does not, appellant emphasizes the length of time between the stabbing and death and centers primarily upon the testimony of Dr. Keith Hester, who performed an autopsy upon the deceased the day of her death. His testimony was in part as follows:
"Q What, if anything, did you observe?
 "A There was a recent surgical incision which was healing with a rather long incision in the midline and there were *Page 1169 
two stab wounds, one in either side of the abdomen.
 "Q If you would, Dr. Hester, if you would take this pen and mark the stab wounds on what has been marked for identification as State's 1 [a photograph of the body of deceased before it was embalmed and before the internal examination by Dr. Hester].
"A (Witness makes mark on Photograph).
 "Q Now, after you made your external examination, did you make an internal examination, Dr. Hester?
"A Yes.
"Q What did you observe in the internal examination?
 "A The cause of death was due to multiple pulmonary emboli which are clots that have caught in the vessels supplying the lungs and also she — there was evidence of a surgical procedure in the abdomen.
"Q Where did these clots come from, Dr. Hester?
 "A They came from the inferior vena cava which is the large vein that runs lengthwise of the body.
"Q What caused these clots?
 "A There had been a perforation of the inferior vena cava and this had been repaired making a rough inner surface of the vessel at that point and the clots had formed on this roughened area in the vessel.
"Q After these clots formed, what happened, Doctor?
 "A They came loose from the pressure of the blood behind and went up through the heart and lodged in the vessels to the lungs.
 "Q You have made reference to death as multiple pulmonary emboli. Does this have a layman's term?
"A Clots in the lungs would be about the only way —.
"Q How does this cause death?
 "A It completely stops the blood supply to the lungs and there is no blood going through the lungs. It can't be oxygenated and you don't have oxygen to carry it through the body.
"Q It's sort of like suffocating?
"A It gives you the same result, yes.
"Q And so, what then is the cause of death?
"A Multiple pulmonary emboli."
During the cross-examination of Dr. Hester, he testified:
 "Q Did you find or did you search for clottings in any other areas of the body other than the inferior vena cava?
 "A Well, normally, in the process of doing the autopsy you look for well formed clots which I did not find.
"Q You found no other clotting?
"A No.
 "Q Would you have been able to tell if she had had phlebitis by this autopsy prior to this operation?
"A Probably not, no.
 "Q Is it possible, Doctor, that this lady had — could have suffered from phlebitis or blood clotting prior to this attack?
"A It's possible, yes.
 "Q And if she had suffered from that disease, could it have been possible that this clotting could have been the cause of her death from that?
 "A These clots were pretty large to have come from veins in her leg. They were larger than you usually see from the veins down in the legs, from phlebitis.
"Q Is it possible, though, Doctor?
"A It's possible, yes.
 "Q What you're testifying to is, Doctor, is it's your opinion —
"A That's correct.
. . . . .
 "Q Now, Doctor, you said you had examined some surgical procedures that you found in the body?
"A Yes, sir.
"Q Where were those surgical procedures?
 "A The inferior vena cava had been repaired just below the renal artery.
"Q How had it been repaired, Doctor?
"A By suturing.
"Q And did you examine the suturing itself? *Page 1170 
"A Yes, they were holding well.
"Q They were holding well.
"A Yes.
. . . . .
 "Q All right, sir. Did one of those stab wounds correlate with the puncture that had been sutured in the vena cava?
"A Yes. The one on the right.
"Q On the right side?
"A Yes.
 "Q Did the one on the left side in any way contribute to this death?
"A No."
The evidence also shows without contradiction that prior to the time Carol Ann Smith was stabbed by defendant she was in good health. Although she made a trip to the bank between the time she was released from the hospital and her return to the hospital for treatment until her death, she was greatly disabled. Her mother testified:
 "Q Mrs. Mincey, while your daughter was home with you from the time between December 4th and the 18th, did you have an opportunity then to observe her?
"A Yes, sir. Very much, very much so.
"Q Was she in good health or bad during this time?
 "A Very bad, sir. Carol couldn't do nothing for herself.
"Q Was she able to get around the house any?
 "A Oh, no, sir. She couldn't get around. She couldn't step that far (indicating). She shuffled her feet when she walked.
"Q Mrs. Mincey, was she able to feed herself?
"A No, sir.
"Q How did she eat?
 "A It was either me or my husband — she ate very little maybe soup, and we would put it on a tray and her little girl would take it in to her, put it across the bed, and she would drink from it. She has three children.
 "Q Mrs. Mincey, during the period of time that your daughter was home with you after she was stabbed, did she ever go to the doctor?
"A Yes."
Her mother further testified as to the difficulty they had in taking her to the doctor.
Where, as here, the wound inflicted by defendant upon the victim is dangerous to life, the fact that there are other contributing causes of death does not prevent such a wound from being the legal cause of death. It does not have to be the sole cause. This is true whether (1) the other cause precedes, (2) the other cause is synchronous with, or (3) the other cause follows, commission of the felonious act charged. State v.Morea, 2 Ala. 275; Barron v. State, 29 Ala. App. 137,193 So. 190; Harvey v. State, 15 Ala. App. 311, 73 So. 200, as to (1) —Jordan v. State, 82 Ala. 1, 2 So. 460, as to (2) — Ingram v.State, 29 Ala. App. 144, 194 So. 694, cert. denied 239 Ala. 244,194 So. 697; Warren v. State, 32 Ala. App. 273, 25 So.2d 51;Hearns v. State, 47 Ala. App. 725, 261 So.2d 64; Smith v. State,54 Ala. App. 237, 307 So.2d 47, as to (3).
In Ingram, supra, in which a conviction for manslaughter in the first degree was upheld, defendant had inflicted a knife wound on the alleged victim on July 31, 1937, from which she died on November 13, 1937. That the intervention of days or weeks or months between the criminal act of the defendant and the death of the victim is a mere circumstance, and not usually an important factor, in determining legal responsibility for homicide is emphasized by the common law rule which permits the prosecution of a homicide case regardless of the time between the wrong and the death of no more than a year and a day.Howard v. State, 24 Ala. App. 512, 137 So. 532, cert. denied223 Ala. 529, 137 So. 535; Flannagin v. State, 48 Ala. App. 559,266 So.2d 637, aff'd, 289 Ala. 177, 266 So.2d 643.
Even though the State is not required to dispel every possible doubt or to show by the evidence that some other conceivable cause of death did not cause death, we are persuaded that there is little, if any, reasonable basis for a conclusion that the death was not caused by one of the stab wounds inflicted. *Page 1171 
Appellant's only other insistence on reversible error is as to the action of the trial court in overruling defendant's objection to the admission in evidence of the photograph of the victim's body prior to embalmment and the autopsy. The photograph is a view of the left front of her face and bare body to about the middle of her thighs, with a cloth or paper covering a large part of the area of the junction of the thighs. After the photograph had been definitely established as an accurate portrayal of the body examined by Dr. Hester as related to him in his direct examination and his cross-examination and identified by the man with whom Carol Ann was living at the time of her death as the body of Carol Ann, it was offered in evidence by the State. Thereupon, the following occurred:
 "MR. ALTON: We object, Your Honor. The picture clearly has no probative value in this case. It's done to inflame and prejudice this Jury.
"THE COURT: Overrule the objection.
"MR. ALTON: We except."
The photograph had probative value in showing the places of entrance of the knife into the stomach of the victim, in showing the location and size of the large scar of the surgical incision and in identifying the body shown in the photograph as that of the alleged victim and as the body examined by Dr. Hester.
Appellant now specifically refers to a discolored, and apparently bruised, area at the proximal end of decedent's left thigh, about the full width of the thigh and extending to, but becoming relatively minimal at, the bottom of the picture. We are not enlightened by either side as to the cause of such discoloration. The objection made was as to the photograph itself, in its entirety, and the trial court's attention was not invited to any particular part of the photograph that should have been excluded from the view of the jury. Appellant relies now upon the principles recently stated in Thigpen v.State, 50 Ala. App. 176, 277 So.2d 922, 925, as follows:
 "Photographs to be admissible must be sufficiently limited to such amount of the human anatomy as is necessary to show the wounds and must have some tendency to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered. They must have a tendency to shed some light upon some material inquiry. Knight v. State, 273 Ala. 480, 142 So.2d 899; Rollings v. State, 160 Ala. 82, 49 So. 329; Nichols v. State, 267 Ala. 217, 100 So.2d 750; and Baldwin v. State, 282 Ala. 653, 213 So.2d 819."
Neither in Thigpen nor in any of the cases cited therein, was there a question whether the death of the particular victim was caused in whole or in part by the condition of some visible part of the body other than that which was in the area of the wound inflicted by defendant. In the case now under review there was a contention made by defendant, and is made by appellant here, that phlebitis in the legs could have caused the death. We are unable to say that such contention of defendant accounts for the failure of the State to offer to cover, or otherwise remove from the view of the jury, the part of the photograph below the area of the stab wounds, but we can see that it could have been reasonably contended by either side that, by reason of the question raised by defendant as to phlebitis in the legs, the portion of the photograph that revealed about one-half of the thighs of deceased should have been allowed to remain as a part of the exhibit. Whether this feature of the photograph was beneficial to defendant, or to the State on the other hand, is a matter of conjecture only, but whatever distraction there was, if any, in the apparent contusions of the thigh, as revealed by the photograph, was in the direction, at least, of defendant's contention that vascular abnormalities of the legs, rather than the stab wounds, were the cause of death.
If, as now argued by appellant, "The photograph should have been strictly limited to the abdominal area of the deceased," the responsibility for its not being so limited *Page 1172 
was not solely, if at all, that of the Court. No request was made for such a limitation; no objection was addressed to the specific area now specifically deemed objectionable. When a party objects to a document as a unit that contains admissible as well as inadmissible matter, the trial court is justified in overruling the objection. Evans v. Patterson, 269 Ala. 250,112 So.2d 194; Willingham v. State, 261 Ala. 454, 74 So.2d 241;Cooley v. State, 233 Ala. 407, 171 So. 725; Morris v. State,32 Ala. App. 52, 22 So.2d 105; Johnson v. State, 32 Ala. App. 101,22 So.2d 102; Gamble, McElroy's Alabama Evidence, § 426.01 (13) (1977). The rationale of such a rule and of the authorities supporting it is applicable to the matter now considered. The record does not indicate that the admission of the photograph in its entirety was any more objectionable to defendant than for the court to have sua sponte limited it as now suggested. The court was not in error in overruling defendant's objection to the evidence as offered and admitted.
We have searched the record for error prejudicial to defendant and have found none. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge Leigh M. Clark, serving as a judge of this court under the provisions of § 6.10 of the New Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment below is hereby
AFFIRMED.
All the Judges concur.