In the fall term of 1977, the Etowah County Grand Jury indicated the appellant for first degree murder and robbery. He was arraigned on these charges and entered a plea of not guilty, and not guilty by reason of insanity.
Upon motion of defense counsel, the appellant was referred to Bryce State Hospital for psychiatric evaluation. In a letter from the hospital, dated June 14, 1978, the appellant was certified mentally competent to stand trial. *Page 1120 
On June 19th and 20th of 1978, the appellant was tried on the above charges before a jury in the Etowah Circuit Court. On June 21, 1978, he was found guilty of murder and sentenced to life imprisonment. On the same date, the jury also found him guilty of robbery and sentenced the appellant to twenty years imprisonment.
Jerry Russell Alderson and two juveniles, Ricky Rawlinson and Charles Alexander, were employed at Judy's Oyster Bar near Jacksonville, Alabama, on the evening of October 8, 1977. According to Ricky Rawlinson, at approximately 11:00 P.M., the three young men left the establishment, accompanied by Ricky's mother, who was also employed at the oyster bar. After taking Mrs. Rawlinson to her home, the three companions then drove Mrs. Rawlinson's blue Chevrolet in search of some friends. After some ten to twenty minutes, they drove to Gadsden, Alabama, and then toward Attalla.
About 1:30 A.M., at the intersection of Alabama Highways 278 and 77, north of Attalla the three companions picked up a hitch-hiker. Ricky Rawlinson and the appellant, who was driving the automobile, were in the front seat, and Charles Alexander and the hitch-hiker rode in the back seat. The hitch-hiker asked to be taken to Attalla and the appellant began to drive. Subsequently, however, the appellant stopped the car and pulled off the road, saying he had to use the "bathroom." At that time, all four people left the car.
Rawlinson noticed that, when he got out, the appellant got a tire tool from under the front seat of the car and placed it on the trunk of the automobile. Rawlinson and Alexander started to get into the car, the appellant delayed and Rawlinson turned and saw the appellant raise the tire tool and strike the hitch-hiker on the head.
In Rawlinson's words, ". . . I seen him raise the tire tool in his hand and I poked Eddie on the back and told him to find out what Jerre was doing and then we seen him hit him."
The victim, Harold Coffelt, fell to the ground, into a drainage ditch. The appellant dragged Coffelt from the ditch and raised his shirt to check for a heartbeat. Next he searched the victim's pockets and took a watch, a key, a wallet and some change.
Rawlinson testified that the appellant then stated that he thought he saw the victim's arm move, at which time the appellant stated, "Well I'll fix that now. . . ." The appellant then hit the victim on the head again and pushed him into a drainage ditch flowing with water.
At that point, Rawlinson said he told the appellant, "I'm going to leave," and he and Alexander got into the car. The appellant entered the car and Rawlinson started driving toward Anniston, Alabama. The appellant, during that time, went through the victim's wallet and threw everything out the car window except the money ($10.22) and the victim's watch.
According to Rawlinson, the appellant "asked us ain't we ever seen anybody be killed before," and said, "I've done this plenty of times before."
Further, Rawlinson stated that, on the way to Anniston, they gave another hitchhiker a ride that evening, but took him to his requested destination without harming him.
During cross-examination, Rawlinson testified that he was "picked up" by the police in Anniston on October 24, 1977, along with Alexander and the appellant, on a charge of "Auto Grand Theft." He also stated that he had a juvenile petition pending in Etowah County at the time of the present trial. Further, he said that after two weeks in custody at the Coosa Valley Regional Juvenile Center, he and Alexander volunteered statements about Coffelt's murder while being questioned about other crimes at the Anniston Police Station.
Charles Alexander, one of the three present when the victim was killed, gave substantially the same testimony as that of Ricky Rawlinson. However, Alexander did state that, when the appellant went through the victim's wallet he told them that the victim had ten dollars and twenty-two cents. Further, Alexander said that *Page 1121 
the appellant did not give any of the money to him or Rawlinson. He also testified that, on their way to Anniston from Altoona, where the murder occurred, the appellant said that, "I'd better not ever tell nobody about this thing, and then put a knife in my throat and said if I did he'd kill me."
James Buttram, State Toxicologist, testified that, on October 12, 1977, he performed a post-mortem examination on the body of the victim, Harold Coffelt. He said that the examination revealed evidence of what appeared to be "blunt force damage to the body at the surface of the right temple and underneath." Underneath this penetrating wound was a "depressed fracture of the skull. . . . there was a bruising of the brain damage underneath that location."
Further, the toxicologist stated that other portions of the body showed evidence of abrasions or "scraping type" wounds. He stated also that, "[t]here was evidence of fluid accumulation in both of the plural cavities, the lung cavities of the chest, and . . . about one-third of a pint of watery fluid in the stomach."
He stated that, in his opinion, the death was a "result of asphyxia or interference with the air supply to the body as a result of drowning." Regarding the severity of the "blunt force trauma" on the head, Buttram stated that, in his judgment, "that wound would probably have produced incapacitation, probably a period — I don't know how long of unconsciousness."
During cross-examination, Buttram stated that there was .02 percent ethyl alcohol in the blood of the victim, but that this amount of alcohol would not permit him to give an opinion regarding the amount of alcoholic beverages the victim had consumed prior to his death.
During the trial, the State introduced separate written statements by Rawlinson and Alexander, which corroborated their testimony at trial. Also admitted into evidence was the appellant's written statement, which was similar in nature to the story told by Rawlinson and Alexander.
In the appellant's version, however, he stated that Rawlinson and Alexander had struck the victim with the tire tool. According to the appellant, he struck the victim with his fist only after which, the three left the scene. The appellant stated that they returned to the scene later that night, at which time the victim still had a heartbeat. At that point, the appellant said that Alexander struck the victim with a "jack arm." Further, he said that the three returned still another time, at which point, Rawlinson then struck the victim with a lug wrench.
 I
Appellant contends that he was deprived of his constitutional right to confront the witnesses against him, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, when the trial court refused to allow him to cross-examine the State's juvenile witnesses as to their prior criminal records, in order to impeach their credibility.
In support of this contention, appellant cites as authority,Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347.
The facts in Davis are that, in the early morning hours of February, 1970, a safe was stolen in Anchorage, Alaska, and later found near a road outside Anchorage. Green, a juvenile on probation for burglary, was questioned by State troopers and said that he had seen two men standing beside a car near where the safe was found.
Green made a photographic identification of Davis but, prior to trial, the prosecution moved for a "protective order" to prevent any references to Green's juvenile record at trial. Counsel for the defense opposed the motion, maintaining that Green's delinquency would only be used to show that, when aiding State investigators, Green was on probation, and therefore biased. The trial court allowed the protective order, relying on Alaska's juvenile statute, which barred evidence of a juvenile's adjudicated delinquency from being used in subsequent proceedings against the child in any court.
During the trial, defense counsel attempted to expose Green's state of mind at the time he was being questioned by the State's investigator. Defense counsel asked *Page 1122 
Green whether he had ever been interrogated in that manner by the police and Green responded with a curt "no." At that point, the prosecution objected and was sustained, thereby preventing further inquiry into Green's state of mind.
The Alaska Supreme Court affirmed Davis' conviction, stating that he had adequate opportunity to probe Green's possible bias of motive. The United States Supreme Court did not accept the Alaska Supreme Court's conclusion, stating:
 ". . . [W]e conclude that the right of confrontation is paramount to the State's policy of protecting a juvenile offender."
Although the language in Davis seems to suggest that bias is more protected than some other form of impeachment by way of cross-examination, we believe this is an unwarranted interpretation of the case.
However, we believe that the holding in Davis was limited, and was not meant to be a general license to impeach a witness by past juvenile delinquency adjudication in all situations. Justice Stewart addressed this question in his concurring opinion, by emphasizing:
 ". . . [T]hat the Court neither holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination about his past delinquency adjudications or criminal convictions."
Under § 12-15-72, Code of Alabama 1975, proceedings in juvenile court and adjudications of delinquency do not result in criminal convictions or criminal records for youthful offenders.
Impeachment of one's credibility by evidence of a former conviction must be based upon (1) conviction of a crime (2) involving moral turpitude. § 12-21-162, Code of Alabama 1975.
Because § 12-15-72, supra, precludes adjudications of delinquency from being considered criminal convictions, our courts have held that such an adjudication cannot be introduced to impeach a juvenile witness even where the crime serving as the catalyst for the adjudication involves moral turpitude. McElroy, Alabama Evidence, 3rd Ed. § 145.01 (4).
The appellant insists that this reasoning is no longer justified under the rationale of the Davis decision. Whether or not the offenses are denominated as criminal convictions by the Alabama statute, the appellant argues that Davis, supra, requires the admission of a juvenile witness' prior "criminal convictions," under the circumstances of the instant case.
The primary thrust of Davis was to secure for the defendant in a criminal case the right to inquire, within bounds, into the biases and prejudices of those prosecution witnesses testifying against him. Under Davis, this is a requirement that must be done even at the cost of violating the State's policy of protecting a juvenile offender's anonymity.
In the case under consideration, it is our judgment that the trial judge, by a careful exercise of his discretion and judicious rulings, complied with the standards required byDavis. At the same time, he maintained the integrity of Alabama's statutory provision protecting juvenile offenders.
The facts in Davis differ from the case before us. In Davis, a "protective order," prohibiting any reference by the defense during cross-examination, to the witness' prior adjudication was granted to the prosecution prior to trial. This was not the case in the present trial.
Further, in Davis, the juvenile witness, [Green] was questioned as to his feelings concerning possible police suspicion that he may have burglarized the safe and flatly denied such feelings. Over defense objection, he also denied ever being subjected to any similar such police interrogation. Hence, the jury in Davis was left to make its decision with these unchallenged misleading statements by a key prosecution witness.
In the instant case, both juvenile witnesses had been granted probation for juvenile offenses in conjunction with their statements against the appellant. Also, both of *Page 1123 
the young men were awaiting adjudication of juvenile proceedings against them, arising from the same criminal acts for which the appellant was being tried.
Unlike Davis, however, the trial court allowed all of this information to go to the jury and much more, thus making the jury fully aware of any possible bias or motive in testifying that these witnesses might have had, prejudicial to the appellant. This is revealed in the record during the testimony of the witness, Ricky Rawlinson, which reads, in pertinent part, as follows:
"Q. Do you have a juvenile delinquency petition pending here in Etowah County?
"A. [Rawlinson] Yes, sir.
"MR. MOORE: That's all.
. . . . .
"Q. When you were picked up on the 24th of October beside the Anniston Police Department would you tell me in relation to what charge that was on?
"A. [Rawlinson] Grand Theft.
"Q. Grand Theft"
"A. Auto.
. . . . .
"Q. Had you ever been in trouble before?
"A. [Rawlinson] Yes, sir.
"Q. How many times before this particular auto theft?
"A. Twice.
"Q. Twice before. So, this is the third time?
"A. Yes, sir.
"Q. You were a three time loser —
 "MR. MOORE: Your Honor, we object to this line of argument.
 "MR. GARMON: Your Honor, I'd like to finish my question.
"Q. You're saying after three times in the juvenile detention center you were not worried about this possible homicide and you didn't discuss what you and Mr. Alexander were going to say and implicate the Defendant?
"A. [Rawlinson] No, sir.
. . . . .
"Q. And you're how old?
"A. Sixteen.
"Q. Sixteen years old?
"A. Yes, sir.
"Q. You've been charged three time?
"A. Yes, sir.
"Q. With different offenses?
"A. Yes, sir.
"Q. What was the age of the first offense you were charged with?
"A. Fourteen.
"Q. So, at age fourteen you had your first criminal rap?
"A. Yes, sir.
. . . . .
"Q. What, if anything, did you do when you got inside the police department?
"A. [Rawlinson] Well, they started — We went to court about the Grand Theft, Auto.
"Q. You went to court about the Grand Theft, Auto?
"A. Yes, sir.
"Q. You went before a judge?
"A. Yes, sir.
"Q. Did you receive a sentence?
"A. No, sir.
. . . . .
"Q. After you had gone before the court, then you went to the police officers or you went into a room to talk with the police officers and make your statement?
"A. [Rawlinson] Well, see, after the court was over they took us in there. They wanted to find out some things, if we had anything to do with them.
"Q. Some other stealing?
"A. Yeah.
"Q. And you — Did you tell them that you had?
"A. Yes, sir.
"Q. And you had?
"A. We had been involved in one other item.
"Q. Okay. And after telling them that you had been involved in some other stealing *Page 1124 
— By the way, were you ever charged on that?
"A. No, sir.
. . . . .
"Q. Did they offer you any immunity or tell you, say, `If you help us out here and hang Alderson we'll take care of you. We'll make sure that you don't serve any time on this murder rap or that you don't serve any time on any other raps.'?
"A. [Rawlinson] They said if we testified that we, you know, get off pretty easy.
"Q. If you testified you could get off pretty easy?
"A. Yeah.
"Q. Have you been charged in that other stealing case that you told the Anniston Police about?
"A. We was charged and they put us on probation.
"Q. Are you in jail now?
"A. No, sir.
"Q. You're not in Coosa Valey Detention Center?
"A. No, sir.
"Q. When were you put on probation?
"A. December the 6th, I believe.
"Q. Did you stay in the Coosa Valley Detention Center until then?
"A. Yes, sir.
"Q. So, after you cooperated with them, then you got out on probation on December 6th?
"A. Yes, sir.
. . . . .
"Q. These juvenile delinquency charges you have pending in Etowah County here, do they concern murder and robbery arising out of this incident with Mr. Coffelt?
"A. [Rawlinson] I don't think so.
"Q. The juvenile delinquency petition that you have here pending in this county, does that concern this incident?
"A. Yes, sir.
"Q. And you are now on probation?
"A. Yes, sir.
"Q. You were put on probation December 6, 1977?
"A. Yes, sir.
"Q. And you were promised easy treatment or you would be taken care of if you made your statement against the defendant as far as your part in that crime?
"A. Yes sir."
During the testimony of Charles Alexander, we find that the appellant was again allowed to show the jury any potential bias of the witness. From the record, we find the following:
"Q. Have you ever told the police about what happened here?
"A. [Alexander] Yes, sir.
"Q. When?
"A. Let's see, we got put in the center when they picked us up for the grand theft auto and it was two days after we was in the center. We went back down to the courthouse and they was going to see if they was going to let us go home, you know, until Court day on grand theft auto and stuff, and they decided not to let us go home. So Forsythe and Mr. Ledbetter took us over there and started talking to us, and me and Ricky turned ourselves in on that right there. We told everything we did there in Anniston and we told what happened in Etowah.
"Q. And is what you told the police then the same thing you are saying now?
"A. Yes, sir.
"Q. Did you tell them the truth then?
"A. Yes, sir.
"Q. Are you telling the truth now?
"A. Yes, sir.
. . . . .
"Q. You stated that you were picked up on Grand Larceny and Auto Theft?
"A. Yes, sir.
"Q. You were put in the Coosa Valley Detention Center?
"A. Yes, sir.
"Q. How long were you in the Detention Center? *Page 1125 
"A. Forty something days. I think it was 49 days.
"A. All right. How long were you in the Detention Center before you gave your statement to the police about Mr. Coffelt's killing?
"A. Two days.
. . . . .
"Q. Was there any statement by the police officers if you helped them and cooperated and fingered Alderson that they would help take care of you and make sure you didn't serve any time on this charge?
"A. [Alexander] Yes, sir.
"Q. All right. What did they say to you?
"A. They told me that — Forsythe and them, that's the way they do everbody. They say, you know, if you will help them they will help you. You know, they will cut the strings loose, you know.
"Q. They told you they would go ahead and get you out as soon as they can?
"A. Yes, sir. He said that — You know, he talks like he can get you out of anything, you know, so you will tell. But it was getting on me anyway so I went ahead and told.
"Q. So he told you that if you would help them out that he would help you out?
"A. Yes, sir.
"Q. And you had just been there in the Detention Center a couple of days when you gave your statement?
"A. Uh-huh.
. . . . .
"Q. What happened to that charge you were picked up on originally which led to your giving your statement?
"A. [Alexander] The Grand Theft Auto?
"Q. Right.
 "MR. MOORE: Your Honor, we object to any disposition on that charge as earlier objected to. We renew our objection.
"THE COURT: Overrule.
"Q. You may answer.
"A. Sir?
"Q. You may answer.
"A. They put it aside and they was going to find out what happened down here and then we was going to have another trial down there in Anniston and see what they were going to do with those charges. They put us on probation for those charges.
"Q. They put you on probation. Those charges have been disposed of then if you were put on probation.
"A. Sir?
"Q. They have been disposed of if you were put on probation.
"A. No, sir.
"Q. How many weeks or months were you put on probation?
"A. They didn't say. Yes, six months.
"Q. Six months probation?
"A. In Anniston, yes, sir.
"Q. Pending you coming down here and telling your story?
"A. Yes, sir.
"Q. Has anyone mentioned to you that how you tell your story will depend on how the case might come out later on after this six months period is over with?
"A. Sir?
"Q. Have you been told that if you cooperate after your probation period is over with that will be it?
"A. I don't understand what you are talking about.
"Q. All right, now, if you cooperate and let's say tell your story, in other words, you and Mr. Alexander and Mr. Rawlinson tell your stories and finger the defendant that that will more or less take care of those charges, that you won't have to serve any time. Have you been told that?
"A. No, sir.
"Q. There has been no promises that they will take care of you?
"A. No, sir.
"Q. For telling your story?
"A. No promises.
. . . . . *Page 1126 
"Q. But you told your story implicating the defendant based on the promises of the officers and the authorities that if you would tell your story they would take care of you?
"A. [Alexander] That's what they said.
"Q. Okay. Who is they?
"A. Forsythe and Ledbetter. And there was people from Etowah in the room when they said that.
"Q. There were people there from Etowah when they said that?
"A. Yes, there were.
. . . . .
"Q. But you were promised immunity when you made your statements if you would cooperate with the police and lay the rap on the Defendant, you'd be given immunity?
 "MR. CARNES: We object. Assuming this man knows what immunity is.
"THE COURT: Sustained.
"Q. Were you told that you would be taken care of? Lighter sentence or probation would be given to you if you would cooperate against Mr. Alderson?
"A. [Alexander] By the Anniston Police, but he did not lay it on nobody."
Although we find that the appellant was prevented from presenting the criminal records, per se, of the two juvenile witnesses to the jury, we also find that appellant's counsel was given every opportunity to acquaint the jury with any possible potential for bias on the part of each of these witnesses. Although the specific question concerning their criminal record was not allowed by the trial court, as can be seen from the foregoing portions of the record, evidence possessing the same probative force was, in fact, allowed. In view of the foregoing facts, we believe that the appellant's right to confrontation was not diminished to the extent that would cause it to be constitutionally impermissible under the mandates of Davis.
 II
The appellant insists that the State failed to prove a prima facie case of murder in the first degree. He argues that the necessary elements to support his conviction on a charge of first degree murder were not shown and that statements by the State Toxicologist and County Coroner showed that the deceased drowned. Appellant maintains that the drowning was not a foreseeable result of any act of the appellant.
The indictment in the instant case, in pertinent part, reads as follows:
 "The Grand Jury of said County charges that before the finding of this Indictment Jerry Russell Alderson . . . whose name to the Grand Jury is otherwise unknown than as stated, unlawfully, and with malice aforethought, killed Harold Coffelt, by striking him with some instrument, a further description of which is unknown to the Grand Jury, and by pushing or rolling his body into a concrete culvert whereby he was drowned, contrary to law and against the peace and dignity of the State of Alabama."
In Huckabee v. State, 159 Ala. 45, 48 So. 796, 798, the Alabama Supreme Court stated:
 "To render a defendant guilty of homicide, it is not necessary that the blow given by him, or that the agency or means used by him, or that his wrongful act, should be the sole or necessary cause of death complained of. If his wrongful act, agency, means, blow, or the like, accelerates or contributes to the death, he may be responsible, according to the circumstances of the particular case."
This court, in Smith v. State, Ala.Cr.App., 354 So.2d 1167, also set down the standards for determining cause of death by stating:
 "Where, as here, the wound inflicted by defendant upon the victim is dangerous to life, the fact that there are other contributing causes of death does not prevent such a wound from being the legal cause of death. It does not have to be the sole cause. This is true whether (1) the other cause precedes, (2) the other cause is synchronous with, or (3) the other cause follows, commission of the felonious act charged."
The evidence presented by the State at trial revealed that the appellant struck the *Page 1127 
victim on the head twice with a tire tool, rendering him unconscious. The appellant then placed the victim in a drainage ditch which was flowing with water. The coroner testified that: [T]he blow to the head would have caused unconsciousness. It was sufficiently severe to produce incapacitation of that human being and thereby being placed in the drainage ditch which did cause drowning."
The State Toxicologist, James Buttram, testified that death resulted from ". . . asphyxia or interference with the air supply to the body as a result of drowning."
It is clear that the State offered sufficient proof to permit the jury to reach the determination that the victim drowned, after the appellant purposely rendered him unconscious and placed him in the water-filled drainage ditch.
Although the head wound alone may not have caused death, it was certainly appellant's overt and purposeful act of placing him in the water-filled drainage ditch, which ultimately "accelerated, contributed, or caused the victim's death." Smithv. State, supra. In any event, whether the appellant's acts caused Mr. Coffelt's death is a question to be determined by the jury. Wiggins v. State, Ala.Cr.App., 354 So.2d 340.
It is our judgment that the evidence presented by the State raised questions of fact for the jury and the evidence was sufficient to sustain the conviction of murder and robbery. Therefore, the denial of the motion to exclude the State's evidence did not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843.
We have examined the entire record in the present case and have found no error prejudicial to this appellant. Therefore, the judgment of conviction by the Etowah Circuit Court is affirmed.
AFFIRMED.
HARRIS, P.J., and TYSON and BOWEN, JJ., concur.
BOOKOUT, J., concurs in result. *Page 1369