261 So.2d 64

**Jessie HEARNS, Jr., alias**

v.

**STATE.**

**6 Div. 69.**

Court of Criminal Appeals of Alabama.

March 28, 1972.

Rehearing Denied April 11, 1972.

Robert R. Kracke, Birmingham, for appellant.

MacDonald Gallion, Atty. Gen., and Owen Bridges, Asst. Atty. Gen., for the State.

ALMON, Judge.

Jessie Hearns, Jr., was indicted for murder in the first degree of Inez Cephes. He was found guilty of murder in the second degree and punishment was fixed at thirty years in the penitentiary.

The State's case was based largely on circumstantial evidence as no eye-witnesses were produced.

The deceased operated a boarding house in which she lived in a ground floor front room directly across the hall from the room which appellant occupied.

State's witness Willie Roberts lived in a funeral home across the street from the boarding house operated by the deceased. On the morning of July 27, 1967, Roberts went to the boarding house to get a soft drink from a vending machine in the hallway. On the way he saw the deceased sitting on the front porch and they exchanged greetings. Inside the house, he encountered appellant standing in the hallway. He did not see or hear anyone else. Roberts bought the soft drink he had come for, left the house through the front door, and walked back across the street to the funeral home. There he stood on the steps drinking his drink. He paid no particular attention to the boarding house; however he testified he did not notice anyone entering or leaving through the front door of the boarding house, which was the only door he could see from where he stood. About five minutes later appellant approached Roberts, who was still standing on the steps drinking his drink, and asked him to call the police. There was blood on appellant's shirt, pants, and shoes and on a rag which was wrapped around his hand. He told Roberts that somebody had tried to attack the deceased, that he had grabbed the assailant, and that the man had cut appellant's hand. Roberts refused to call the police. Appellant then said he thought he heard something in the boarding house and was going to go over there and kick the door down and find out what was happening. He rushed back across the street and into the house. Roberts heard a noise which sounded like a door being kicked and a woman's voice say, "Lord, have mercy." Roberts then told the manager of the funeral home about appellant's request for the police and the manager presumably called them.

Police Officer J. S. Isbell of the City of Birmingham arrived at the boarding house three or four minutes after he received the radio dispatch directing him there. When he arrived he saw appellant standing on the sidewalk in front of the house. Appellant told Isbell that as he had opened the

front door to enter the house he saw a man whom he did not know but whom he was able to describe in some detail, coming out of the deceased's room. Appellant said that he had tried to stop the man but the intruder had cut appellant's hand with a knife and had run out the back door. Isbell entered the deceased's room and found her lying on her stomach on the floor with a hammer embedded in the top of her head so that the handle pointed backwards. He testified that the head of the hammer was embedded in the deceased's head approximately one inch. He saw that she was still alive from the fact that she was blinking her eyes. He then called an ambulance and when it arrived he assisted the attendants in placing her on the stretcher. As she was being moved to the ambulance the deceased asked Isbell to notify a relative of what had happened to her, but she did not name her assailant. Because appellant's hand was injured Isbell sent him to the hospital in the ambulance with the deceased.

Charles Stevens, a police detective with the City of Birmingham, received a call to investigate the incident about the same time as Officer Isbell and arrived at the scene after appellant and the deceased had been sent to the hospital, but while Isbell was still there. He entered the house and found that the back screen door was locked from the inside. He testified that there were no other doors providing entrance to or exit from the house. In appellant's room he observed blood on the bed and on the floor and no sheet on the bed. In a bathroom down the hall he found blood on the floor and a bloody sheet stuffed under the bathtub. He testified that the window screen was cut and pushed out, but that the hole was not large enough to permit a human body to pass through.

Another police officer with the City of Birmingham, A. A. Peacock, arrived at the scene after witness Isbell but before witness Stevens. When he arrived Isbell gave him a description of the man whom appellant said he had seen coming out of the deceased's room. Peacock then drove around in the vicinity of the boarding house for ten or fifteen minutes looking for a person matching appellant's description but he failed to find one.

W. M. Parker, the deceased's cousin and the individual the deceased asked Officer Isbell to call, testified that on the morning of the assault he had seen appellant at the hospital. He stated that appellant told him that his hand had been cut by a man who was attacking the deceased. His description of the man's clothing did not match the description which he had given to Officer Isbell.

W. L. Allen, a deputy coroner, saw the deceased's body in the hospital morgue on the day following the assault. He testified that she was dead when he saw her. He further stated that he examined her head and found a depressed skull fracture which had been reduced by surgery. The trial court refused to allow him to testify concerning the cause of death.

Appellant's only defense was an attempt to introduce into evidence medical records pertaining to his injury. When the trial court sustained the State's objection to this attempt, appellant called the physician who had treated him at the hospital for his injured hand on the morning of the assault. An attempt was made to elicit from this witness appellant's medical history as given by the appellant to the witness during treatment. The trial court sustained all objections interposed by the State to the introduction of such testimony.

Appellant's counsel argues that the State failed to meet the burden of proving the corpus delicti. In a murder prosecution the corpus delicti is established by proof of the victim's death and proof

that death was caused by some person's criminal agency. Spain v. State, 37 Ala. App. 311, 68 So.2d 53. It is well settled that this may be proven by circumstantial evidence. Kozlowski v. State, 248 Ala. 304, 27 So.2d 818; Rowe v. State, 243 Ala. 618, 11 So.2d 749. Numerous cases to this effect are found in the Alabama Digest under Homicide, ☞ #228(2).

■ Thus, if a reasonable inference of the existence of the corpus delicti is deductible from the evidence, the court should submit to the jury the sufficiency and weight of the evidence tending to support that inference. McCall v. State, 262 Ala. 414, 79 So.2d 51. It is certainly reasonable to infer that someone hit the victim in the head with a hammer other than the victim herself. Indeed it would require a stretch of the imagination to conclude that the wound was self-inflicted, since the hammer was found embedded in her head with the handle pointing toward her back. The evidence tended to show that appellant was the only person in close enough proximity to have committed the act. Moreover, appellant's claimed encounter with an alleged intruder left many physical facts unexplained; such as, the back door being locked from the inside, the bloody sheet stuffed under the bathtub down the hall, and appellant's sheet missing from his room. These facts viewed from the standpoint of time seemed inconsistent with appellant's statements of the occurrence.

■ The appellant further contends that under the evidence the deceased may have died as the result of a slip of the physician's knife while she was undergoing surgery for her head injury. This, of course, is supposition and there was no evidence that any complications whatsoever arose during the surgery. However, the law is well settled that where a wound is in itself dangerous to life, mere erroneous treatment of it will afford the defendant no protection in a charge of unlawful hom-

icide. Huckabee v. State, 159 Ala. 45, 48 So. 796; Pyles v. State, 38 Ala.App. 123, 78 So.2d 813, reversed on other grounds 262 Ala. 1, 78 So.2d 816; Washington v. State, 31 Ala.App. 41, 13 So.2d 200, cert. denied 244 Ala. 312, 13 So.2d 203; Ingram v. State, 29 Ala.App. 144, 194 So. 694, cert. denied 239 Ala. 244, 194 So. 697; Tate v. State, 23 Ala.App. 122, 122 So. 461, cert. denied 219 Ala. 361, 122 So. 462.

■ The trial court properly refused to admit certain hospital records in evidence at the insistence of the appellant as no proper predicate was laid as required by Tit. 7, § 415, Code of Alabama, 1940, as recompiled 1958. There was no showing that these records were kept in the regular course of business.

■ Appellant also argues that the trial court was in error in sustaining the State's objection to the following questions addressed to Dr. Norris:

"Q. Tell this jury what the history given by Jessie Hearns at that time was, please?"

"Q. If you were told in this case that the patient had sustained a laceration across the hand by a knife, would you take that into consideration in forming —"

"Q. From the observations you made on that day, doctor, do you have a judgment as to how the lacerations were made?"

On cross-examination the record shows the following exchange:

"Q. (BY MR. ELLIOTT:) You would not be able to state whether or not he was cut with a sharp metal, or sharp glass? I believe you have stated that he was cut with a sharp instrument, or apparently some sharp substance?

"A. Yes, sir.

"MR. KRACKE: I object, your Honor.

"THE COURT: You can go into it now, if he wants to go into it. Both of you all are determined into it [sic], and get opinions about how it happened, and you sure can. I take the halter off.

"MR. ELLIOTT: No questions.

"MR. KRACKE: That's all.

"THE COURT: All right. Are both sides willing for the doctor to be excused?

"MR. KRACKE: Yes, sir.

"MR. ELLIOTT: Yes, sir.

"MR. KRACKE: That's all for the defendant, your Honor."

The "history" appellant sought to elicit from the witness was appellant's self-serving account of his alleged encounter with the intruder in the hallway of the boarding house. At that point in the course of the trial the same account had already been given by three witnesses—Parker, Roberts and Isbell—and the jury was no doubt thoroughly familiar with it. But more importantly, the portion of the record set out above shows that the trial court withdrew its previous ruling which had excluded the testimony in question and offered to allow the witness to testify concerning the "history" of appellant's wound, yet appellant voluntarily refused to pursue the matter. Appellant is thus in no position to complain against the original ruling. See Spinks v. State, 14 Ala.App. 75, 71 So. 623.

For the foregoing reasons, the judgment appealed from is due to be and the same is hereby

Affirmed.

PRICE, P. J., and CATES and TYSON, JJ., concur.