Ronald Earl James was indicted by the grand jury of Cullman County for the first degree murder of Kenneth Farr. Following a jury trial, he was convicted of murder in the second degree and sentenced to thirty years in the penitentiary.
Defense counsel's motions to exclude the State's evidence, for a directed verdict, and for a new trial, were denied by the trial court. Appellant filed a notice of appeal, and the trial judge made a determination of indigency on his behalf and entered an order to provide appointed counsel and a free transcript.
The pertinent facts presented at trial are as follows:
On the night of April 21, 1977, the appellant, Ronald James, his brother, and two female companions, Denise Howard and Judy Allred, met at a friend's apartment and went to a bootlegger's, where they purchased a quantity of liquor which they drank while riding in appellant's automobile.
Later, the group picked up the victim, Kenneth Farr, who purchased more liquor during the course of the evening.
All finally went to the appellant's home, where they stayed until 4:10 on the morning of April 22, 1977. At that time, they left to take appellant's brother, Roger James, to his parent's home. The appellant, Ronald James, was driving.
One of the females, Denise Howard, testified that, after Ronald returned from the *Page 1157 
house, Farr leaned against Judy Allred, who was sitting in the front of the car next to the driver. Farr asked to see the gun and the appellant stepped out of the car, turned and shot him. Miss Howard stated that the victim's left hand was on his leg at the time he was shot and that she did not see him take hold of the gun. She testified that, after the shooting, Farr was ordered out of the car by James. The two females also got out of the automobile and James drove off.
According to Miss Howard, the two girls left the victim lying on the ground near the James' home. They then went into the house and told appellant's parents what had happened. After remaining in the house for approximately fifteen minutes, Miss Allred left the house and went to the victim's side. Miss Howard followed a couple of minutes later and found Miss Allred holding the victim's hand. Farr was able to talk and asked someone to take him to the hospital.
The defendant had returned to the house by this time and, as he backed his car from the driveway, he stopped, and, according to Miss Howard's testimony:
 "[H]e first asked if Kenneth was alright and Kenneth said no, get me to the hospital, he didn't say nothing after that and Kenneth said — Ronnie said he was leaving and I said where are you going and he said I'll be back in a minute and then he left."
Miss Howard recalled that after the shooting, James had told her and Miss Allred to tell the police that he had shot the victim because Farr had pulled a knife on him. She also testified that it was a "good fifteen minutes" before the ambulance arrived, and that the victim did not have a knife or a gun, and did not touch the gun or James at any time. She further stated that she had heard no threats, cursing or evidence of any fight between the victim and the defendant during the evening.
During cross-examination, Miss Howard admitted that she had testified at the preliminary hearing that she could not see over the back seat of the automobile and could not have seen where the victim's left hand was, but during the trial she remembered that after the shooting the victim's left hand was on his leg.
Bobby King, the ambulance driver, testified that he took the victim to the hospital and was accompanied in the ambulance by Miss Howard and Miss Allred. According to King, the victim was bleeding from the front of his left shoulder. During cross-examination, King was asked:
"Q. Did you talk to Kenneth Farr on that occasion?
"A. Yes, sir.
"Q. Did he tell you that it was an accident?
"MR. BLAND: We object to that.
"MR. POWELL: It is cross-examination.
"MR. HARTWIG: It is part of the Res Gestae.
"MR. BLAND: I object to it.
 "THE COURT: Just a minute, now let's don't have any discussions in the presence of the Jury, if you want to we will go out of the presence of the Jury. State your objections to the record.
 "MR. BLAND: I object to it because there is no time that he said he talked to him, it is not made a part of the Res Gestae and under the Dead Man's Statute — there was nothing said as to where the conversation took place.
 "THE COURT: Come along with me, Mr. King, just a minute, please.
"Read him the question.
 "MR. BLAND: One more objection before he reads it, that there is no time, as to what time that it —.
"THE COURT: I am familiar with that.
 "MR. BLAND: As to what took place and what time he got there and another grounds for objection is was a matter of time.
"THE COURT: Read the question to Mr. King. *Page 1158 
 "(Whereupon, the last question was read to the witness.)
"THE COURT: You may answer it, overruled.
"A. The only conversation that took place —
 "THE COURT: Don't tell us the conversation, Mr. Powell's question to you, do you remember what that was, he asked you if Kenneth Farr made a statement that it was an accident?
"A. He made no such statement.
"QUESTIONED BY MR. POWELL:
"Q. Did he make any statement to you?
"MR. BLAND: We object to that.
"THE COURT: On the same grounds?
"MR. BLAND: Yes, sir.
"THE COURT: Sustained.
 "(Whereupon, Mr. King and the Judge left the courtroom.)
 "MR. POWELL: Would you show that Mr. King and the Judge left the room, and we reserve an exception?
 "THE COURT: You'll have to lay a fully complete predicate, Mr. Powell.
 "MR. POWELL: Judge, could we reserve a right to cross-examine him tomorrow?"
Later, during further cross-examination of Mr. King, Mr. Powell asked the following:
 ". . . On the morning or on this occasion when you picked up Kenneth Farr and put him in the ambulance during that time and headed back to Cullman tell the Jury, if you will, did he make any statement about his injury?
"MR. BLAND: We object to this.
"THE COURT: After the alleged shooting?
"MR. POWELL: After the shooting, yes.
 "THE COURT: At this point I will sustain the objection.
"MR. POWELL: May we approach the bench?
 "THE COURT: Yes, sir. Don't listen to us, please — maybe we had better go out.
 "Let the record show that outside the presence of the jury, in a jury room —. "MR. HARTWIG: Let the record show that the Defense offered Bobby King to testify to the effect that the decedent made the statement immediately after being shot on the way to the hospital in the ambulance to the effect that I am dying, I am dying, I am dying, I am bleeding to death, I am bleeding to death and subsequent to that time, a matter of seconds, I do not want to press charges, I do not want to press charges thereupon there were objections by the State, the Court ruled that such statements were not admissible as a dying declaration, upon objection by the State —.
"MR. POWELL: We accept [sic] to the court's ruling.
 "(Whereupon, the following proceedings were had in the presence of the Jury.)
 "THE COURT: Do you excuse Mr. King, now, from the rule so he can leave the courthouse — thank you very much."
Dr. Mario Propagni testified as to his background and experience as a medical doctor and stated that he had been practicing at the Cullman Medical Center for about six or seven months prior to the time he saw the victim, Kenneth Farr. He also stated that his partner, Dr. Neumaster, had first treated Farr and that when he (Propagni) saw the victim, Farr's condition was stable and he had been conscious until he was taken to x-ray.
According to Dr. Propagni's testimony, he had "tried to obtain an autopsy and could not, that would allow us to examine all of the organs in the body and see if there was any other pathology." The doctor gave the cause of death as "brain damage, just a — the cause of death is secondary and primary, the primary cause was the gunshot."
During cross-examination, the doctor explained that the victim was suffering from hypovolemia, which is shock resulting from a decreased volume in the blood space, i.e., *Page 1159 
that space in the arteries and the veins occupied by the blood. The blood space in the human body can accommodate "about five quarts." Dr. Propagni said that the victim had "lost three or four liters of blood" and that shock had resulted because the heart was no longer capable of distributing blood to the tissues of the body, in particular to the brain and the liver.
Dr. Propagni described the path of the bullet as downward through the upper lobe of the left lung. He said that:
 "[I]t probably hit one of the ribs in that area, hit the heart, hit the lower lobe and proceeded down into the abdomen, that is conjecture, I have no way of proving it, I wasn't with the bullet when it richocheted around and followed its course."
He said he did not find any damage to the liver but he did locate the bullet in the area where the kidneys were located. He explained that the "current surgical practice is to leave things alone in [that] area unless you envision damage to an organ in that area."
He also testified that the liver was not part of the area where the kidney was located. In his examination of the diaphragm during surgery, Dr. Propagni found that the bullet had penetrated the diaphragm on the back side, which was an area near the heart and away from the liver.
Dr. Propagni gave the date of death as May 2, 1977, approximately eleven days after the victim was brought into the hospital.
James Buttram, the State toxicologist, who performed the autopsy on the victim on May 2, 1977, stated that he had traced the course of the bullet from the upper lobe of the left lung until it reached the right lobe of the liver, where it was lodged. Based on his autopsy, it was his opinion that the primary cause of the victim's death was the bullet wound. He explained: "I found no discernible abnormality on this individual's body to which I would attribute death other than the firearm projectile."
At the completion of Buttram's testimony, the State rested its case, and the defense motion to exclude the State's evidence was denied.
The defense then called Roger James, Ruth James and Troy James, the brother, mother and father of the appellant. They testified in substance that the five young people who came to the James' home on the night of the shooting had been drinking heavily. Roger James stated that the gun used in the shooting was his and that he had placed it under the front seat of the car on the night in question, without the knowledge of the appellant. When he was later taken home he had left the gun in the car.
The appellant took the stand in his own behalf and stated that the first time he had seen the pistol that evening was when he was leaving his parents' home. According to appellant, he first discovered the gun when he "raked [his] foot across it." He stopped the car and told the other passengers that it was his brother's gun and that he was going to take it to him.
Appellant testified that he picked the gun up in his left hand, put it in his right hand, and opened the door with his left hand. At that point, the victim asked for the gun and grabbed it. He said that he and Farr pulled on the gun at the same time, and that Farr had said: "Let me have the gun, let me see it." Appellant identified a watch that he claimed was broken during his struggle with the victim over the gun.
The gun discharged and the victim said he was hit and started getting out of the car on the passenger side. The appellant and Miss Allred started to help Farr into the house when he fell and, due to his weight, they were unable to lift or carry him.
Appellant said he tried to call for an ambulance from the house but received a busy signal. His mother continued trying to call the ambulance while he returned to the victim. He claimed that Farr asked him to leave immediately because he knew that appellant was on parole. The appellant testified that he did not know the gun *Page 1160 
was loaded and stated that he did not pull the trigger intentionally. He admitted that he was on parole for grand larceny and manslaughter and stated that he had pleaded guilty to second degree burglary in 1970 and carnal knowledge in 1966.
Dr. S.L. Crocker, chief of surgery at the Cullman Medical Center, appeared on behalf of the defendant and testified to the non-fatal nature of Farr's injury and the negligent medical treatment that ensued. However, the trial judge would not permit defense counsel to show Dr. Crocker's qualifications and, in a hearing outside the presence of the jury, instructed defense counsel that he should in no way question Dr. Crocker concerning the nature of the treatment administered to the victim by Drs. Propagni and Neumaster. The court also forbade the defense to question the witness concerning the fact that Dr. Neumaster left the victim in the emergency room to perform "elective surgery" on another patient.
 I
The appellant contends that the trial court erred in limiting his cross-examination of the attending physician, Dr. Propagni. From the record, it appears that defense counsel attempted to show that the victim received negligent treatment from Dr. Propagni at the hospital. Later in the trial, defense counsel apparently attempted to do so again by calling the chief of the Cullman Medical Center.
During the presentation of the State's evidence, the trial court restricted appellant's cross-examination of Dr. Propagni in such areas as the path of the projectile, the physician's determination of life-supporting fluids, and his consultation with specialists. The physician did state that the bullet had not penetrated the liver, although a later autopsy showed that the projectile was lodged four to five inches within the liver.
In addition, appellant was prevented from examining other physicians concerning Dr. Propagni's treatment of the victim. Although appellant never specifically stated his purpose in soliciting this evidence, he was apparently attempting to establish that the victim would not have died except for the treatment he received, or failed to receive, at the hands of Drs. Propagni and Neumaster.
We find that appellant's questions presented to Dr. Propagni were not relevant to the issue of appellant's guilt; they dealt primarily with whether or not the bullet struck the deceased's liver. Such has no bearing on the case.
We note, also, that the scope and extent of cross-examination is a matter directed to the sound discretion of the trial court, which will not be disturbed on appeal absent abuse.Diamond v. State, 49 Ala. App. 68, 268 So.2d 850; Jordan v.State, 267 Ala. 361, 102 So.2d 4; Alford v. State, 30 Ala. App. 590, 10 So.2d 370.
The fact that the deceased received negligent or unskilled medical treatment would not have served as a defense to this appellant. Where a wound is in itself dangerous to life, mere erroneous treatment of it would not afford a defense to an unlawful homicide. Hearns v. State, 47 Ala. App. 725,261 So.2d 64.
In Smith v. State, 54 Ala. App. 237, 307 So.2d 47, this court made a similar finding. There, the defendant was convicted of the first degree murder of a ten-year-old child, who was admitted to the hospital in a semi-comatose state and subsequently died. During a post mortem examination, it was discovered that there was a bruise at the back of the child's head and sub-dural hematoma; however, the attending physician had failed to observe any general bruising about the head. The defendant claimed that, because of this oversight, it was possible that the fatal head injury had been sustained after the child's admission to the hospital.
The court stated in Smith v. State, supra:
 "[E]ven if the jury believed from the totality of the evidence that the treatment *Page 1161 
given the deceased during his stay at Baptist Hospital was negligent and unskilled, such a finding would in no way serve as a defense to the person that inflicted the dangerous, if not mortal, injuries upon the deceased. Warren v. State, 32 Ala. App. 273, 25 So.2d 51."
The same principles are applicable in the present case, and in our judgment the trial court did not err in keeping irrelevant matters from the jury.
 II
The appellant maintains that the trial court erred in not allowing the ambulance attendant, Bobby King, to testify as to certain statements made by the victim on his way to the hospital. The appellant reasons that, since the statements indicated that the deceased wanted no charges brought against appellant, the firing of the pistol was an accident, and that any such statements would come under the dying declaration exception to the hearsay rule, and should have been admitted.
A dying declaration must relate to the circumstances immediately attending the act causing the decedent's fatal injury before it can be admitted into evidence. McElroy's Law of Evidence in Alabama, 2nd Ed. § 248.01 (3). Therefore, where the declarant has asserted only that he had nothing against the defendant and did not know that the defendant had anything against him, that statement is inadmissible. Reynolds v. State,68 Ala. 502. See also: Ala. Digest Homicide, § 214 (2). InWilliams v. State, 130 Ala. 107, 30 So. 484, the Supreme Court held that where the victim stated that:
 "[H]e was at fault or to blame for the affair, meaning thereby that he had debauched the defendant's wife, that defendant had been as good to him as a brother, that he did not want any of his relations to prosecute the defendant for the homicide, etc."
the statements had no relation to the circumstances of the homicide and were not admissible as dying declarations, as well as the fact that they were irrelevant and immaterial.
The statement made by the victim in the present case was inadmissible because it had no relation to the circumstances of the homicide. Therefore, the trial court committed no error when it refused to admit the statements by the victim.
 III
Finally, the appellant insists that the trial court erred in removing a witness from the courtroom during cross-examination and moments later returning with him.
The incident in question is included in the foregoing paragraphs quoted from the record. As can be seen from the above account, although defense counsel "excepted" to such actions by the trial court, there was no ruling by the court.
Whether the exception was directed to the sustainment of the State's objection or the action of the judge in leaving with the witness is not shown. No specific objection to the court's action was shown, and, without an objection and an adverse ruling thereon, this court has nothing to review. Wade v.State, 49 Ala. App. 601, 274 So.2d 626.
We have carefully examined the record for error and, finding none, affirm the judgment of conviction.
AFFIRMED.
All the Judges concur.
 *Page 70