Patricia Ann Watson was indicted for murder, in violation of § 13A-6-2(a)(2), Code of Alabama 1975. The jury found the appellant "guilty as charged in the indictment," and she was sentenced to life imprisonment in the penitentiary.
The facts of this case involve the death of a twelve year old boy, Christopher Michael Winget, who was killed when he was struck by an automobile driven by this appellant.
Prior to the victim's death, the appellant, who had a history of mental problems, attended the Achievement Center in Opelika, Alabama. The Achievement Center is a vocation development program for disabled adults. The appellant's disability was a schizophrenic disorder. The day before the victim's death, the appellant was terminated from the Achievement Center because she could not follow her work schedule.
On the morning of this tragic accident, September 12, 1984, the appellant drove to the place on Highway 431 where she normally boarded the bus to ride to the Achievement Center. The bus driver told the appellant she could not ride the bus since she had been terminated from the center. The appellant then replied that she would drive herself.
The bus then proceeded north on 431 towards Opelika. The appellant got back in her car and began following the same route. At some point, as the bus and the appellant's car were going up a hill, the appellant passed the bus even though it was in a no-passing zone. The appellant's speed was approximated at 70 miles per hour. The speed limit in this area was 55 miles per hour.
After the appellant passed the bus, the no-passing zone ended. As the appellant's vehicle reached the top of the hill, she hit the victim, who was walking across the road. The victim was hit in the left hand lane approximately four feet from the edge of the road.
The victim sustained mutiple fatal injuries as a result of the collision and was pronounced dead at the scene.
A sample of the appellant's blood and urine was submitted to the Department of Forensic Sciences. The blood sample tested negative for the presence of alcohol. The urine specimen revealed the presence of 1.0 micrograms per milliliter of mezaretazine. Mezaretazine is a major tranquilizer which is sold under the name of serentel. This drug is used in the treatment of schizophrenia and its effect is to blunt aggressive tendencies and reduce recklessness and agitation. It may cause driving problems such as drowsiness or slowing of response time.
The appellant had been prescribed serentel as well as lithium (a test for lithium was not performed). A bottle of serentel was found in the appellant's car after the accident in question. She admitted to an officer that she had taken one or two tranquilizers on the morning in question. *Page 341 
 I
Prior to trial, the appellant entered pleas of not guilty and not guilty by reason of mental disease or defect. An inquiry into the appellant's sanity was ordered by the trial judge at the appellant's request. The appellant was found competent to stand trial.
During trial, defense counsel sought to introduce the testimony of several employees of the East Alabama Mental Health Center, including one psychologist. The appellant had been treated at the Mental Health Center for her mental problems. The following discussion took place concerning this matter.
"MRS. BROWN: That is correct, Your Honor, and we are not going to go back over the records. We have under subpoena several of East Alabama Mental Health's personnel. There now seems to be a problem with whether they can even testify, or whether they will testify. And I will submit, that I believe, that if they wouldn't get up on the witness stand, that they would be in contempt of this Court under that subpoena. But that's what I need to discuss with Mr. Whittelsey, not anything that is in their records.
"THE COURT: All right. How long do you need, Margaret?
"MRS. BROWN: Probably not more than 10 minutes on the outside. But Mr. Whittelsey is in the other Courtroom and I would probably have to interrupt, unless they have talked with him and have no problem with it at this time.
"THE COURT: Okay. We will take a break at this time —
"MR. MYERS: The problem is not with the District Attorney's office, Judge, there may be a problem between the defendant and the counsel for East Alabama Mental Health, but there is no problem with the District Attorney's office.
"THE COURT: Well, I thought it was all worked out yesterday morning. And then they filed this other motion after we had apparently got it worked out, and then I ruled on that. So, as far as I'm concerned you've got 'em, but I will give you time to talk to them, to Mr. Whittelsey and them.
"Court will be in recess for 10 minutes.
"(Whereupon, a short recess was had, after which the following proceedings were had outside the presence and hearing of the jury.)
"THE COURT: Let the record show that the jury is outside of the Courtroom. Let the record further show, that when a member of the staff of the East Alabama Mental Health Center is called to the stand, I will not, under any circumstances, allow either side to question that staff member about anything that the defendant told them, because I feel like that is highly privileged information. I will allow — and the only reason I know they are here, is from what both sides told me yesterday — is to testify about what drugs, if any, were being prescribed for her by that agency. It was my intentions yesterday, and I so stated yesterday, that I am going to allow them to testify about what different drugs were prescribed for her, and by whom, and in what amount. But I didn't intend for them to have to testify about anything else. Now, Margaret, have y'all got anything else that y'all want to question them about?
"MRS. BROWN: Yes, Your Honor.
"THE COURT: What is that?
"MRS. BROWN: I think we discussed yesterday, that, without going into their records — well, let me back up a little. Our client signed a release, and intends at this time to sign another release releasing them to testify. We would submit to the Court that the privilege of anything that she said to them, from her to them, is hers. And we submit to the Court at this time that she is going to waive that privilege. And at this time we do intend to ask them some questions about what she said, their personal observations, and that type of thing. Now, I understood that the witnesses, without going into the record, of mental health could testify basically on their firsthand knowledge, as to what they observed and what their opinion would be as to those observations. *Page 342 
"We submit to the Court, that as far as their personal knowledge, not based on the records, but from their recollections, that it would not invade their records, that it would not be violating any privilege based on the release of our client. Now, we submit to the Court, that at this point, East Alabama Mental Health has related to us, is, that if we intend for her to sign this release and allow them to testify, that they are going to challenge her competency to at this time sign the release. And we submit to the Court, that at this time that is going to be the question, and my understanding is, and this is from East Alabama Mental Health, is that she signed a release, releasing the records to Joanne Camp, who at the time of that release was her sole counsel, and that she will have to sign a release to allow them to testify; and as I say, we so intend.
"MR. MYERS: Your Honor, we are going to object to any opinions from non experts —
"MRS. BROWN: Judge, lay persons can give opinions.
"THE COURT: Well, excuse me, let him go ahead.
"MR. MYERS: If they are qualified as an expert in a particular field, fine, we don't have any objections to testifying about their observations. But the State also notes, that it is curious at this point that the defendant apparently wishes to execute a release, while at the same time claiming to be not guilty by reason of insanity and not competent to stand trial. So, I certainly can't understand why there would be an issue in that area raised by the East Alabama Mental Health Center.
"MRS. BROWN: We would submit to the Court that we need to litigate this at that time, because we are at trial right now here today, because Bryce Hospital released her and said that she was competent to stand trial. She wasn't brought back from Bryce until Sunday, or Monday. And we would submit to the Court that she is not competent, and shouldn't even be sitting over there.
"THE COURT: Well, here's what I understand the law to be, and I will go over it one more time. As far as the release of records from East Alabama Mental Health Center is concerned, they are barred from use by anyone in the Court, and they are barred from releasing them except where the Court finds that the ends of justice demands that they be released. Now, that's the records, I'm not talking about the oral testimony, that's the records. Now, I have ordered that that part of the orders relating to what drugs, if any, were prescribed for the defendant, the amount of drugs and by whom prescribed; but that part of the records are to be released; that is, they can testify about that. They can testify nothing else about any other written records.
"Now, as far as the circumstances between the people there and your client, that is a confidential communication, made so by the laws of the State of Alabama, and I have the citations under the old code here, Alabama Code Title 46 Section 297 that establishes that as a confidential communication, just like between a lawyer and a client. Even though your client, Mrs.Watson, has waived that, the law requires that the waiver be byboth sides, not just one, unless I'm sadly mistaken that bothsides must waive it. And they say that they are not waiving it.So, for that reason they can't get into anything that was saidbetween the parties out there. Now, I do think, though, that anyone who has observed her over the years, whether it be people there, a doctor, lawyer, layman, preacher, service station attendant, or anyone who has ever observed her, you can ask them in their opinion what they think of her sanity, after establishing the fact that they have had an opportunity to observe her; and in the case of a lay witness describe peculiar acts that she has done, or has been committed in their presence; that's two things that must be shown. And anybody can do that, and that is not subject to the privileged communication at all. But in doing so, you can't force a witness, a doctor or a psychologist, you can't force him or her to disclose anything that was said between them. They can testify: I observed her on ten different *Page 343 
occasions, at the East Alabama Mental Health Center, this, this and this date; and based on my observations of her, and certain acts that she performed, in my opinion, she is insane, or incompetent, or whatever. I think they could even say that she is crazy, that the different cases have ruled one time. But at any rate, anybody can be forced to say that, but as far as anything said between her and the people out at the East Alabama Mental Health Center, I am not going to allow in, because that is a confidential communication; of course unless they waive it.
"MR. MYERS: And as I understand the Court's order, the witness will be able to give a lay opinion as to sanity, but not a lay opinion as to what a certain act might mean.
"THE COURT: Oh, yeah, as to sanity. They can testify as to the sanity of that individual, if they have had an opportunity to observe them. In the event, of course, of a psychologist, I think they would come under the realm of an expert —
"MR. MYERS: If qualified.
"THE COURT: — there, I would think.
"MR. MYERS: If qualified.
"THE COURT: Well, if qualified. And they wouldn't have to testify as to any peculiar acts; whereas a lay witness, the lay witness has to testify as to what peculiar acts they saw someone do in order to base their opinion on.
"MR. MYERS: I would ask the Court, as the witness comes to the stand to instruct the witness, because I would not like to have a question asked and answered before the State has an opportunity to interpose an objection, and then not to be able to go into cross examination of the answer.
"THE COURT: Well, I will instruct each one of them, as they are called from the East Alabama Mental Health Center, that when a question is asked to give both sides an opportunity to object. And if they feel themselves that you are getting into something privileged, to look at me, you know, like am I supposed to answer that. They won't have anybody here to object for them and they are the only ones who will know whether or not you are getting into any confidential communications. I don't think that Mr. Whittelsey, over here, is going to be sitting up on the witness stand by them.
"MRS. BROWN: At this point, we would take exception to the privilege as being a two way street, and relating it to an attorney client documentation, that type privilege, we submit to the Court, that that is the part of the ruling that we take exception to, on release of our client to that information. That's not the records, Your Honor, to the oral testimony.
"THE COURT: All right. Are y'all ready?
"MRS. BROWN: Yes, sir.
"THE COURT: All right. You can let the jury come back in." (R. 333-342) (Emphasis added.)
Defense counsel then called the witnesses, including the psychologist, who had been subpoened. The witnesses were not allowed, as can be seen from the above colloquy, to testify concerning any communications regarding this appellant.
The appellant now contends on appeal that the trial court erroneously interpreted the psychologist-client privilege, enumerated in § 34-26-2, Code of Alabama 1975,[1] by holding that both the appellant and East Alabama Mental Health Center mustwaive the privilege before any confidential communications can be disclosed. We must agree.
In this State, the psychologist-client privilege is placed upon the same basis as the attorney-client privilege.[2] Ala. Code, § 34-2-2 *Page 344 
(1975). In the context of the attorney-client privilege, the invocation of the privilege is "solely the client's prerogative." Swain v. Terry, 454 So.2d 948, 953 (Ala. 1984). Thus, since the privilege is intended for the client's benefit, he alone may waive the privilege. Swain, supra; C. Gamble,McElroy's Alabama Evidence, § 394.01 (3rd ed. 1977).
 "The privilege against disclosure of communications between attorney and client belongs to the client and not the attorney. Therefore, while the attorney cannot divulge information that was communicated to him in confidence until the protection afforded by the privilege has been properly waived by the client, and while an attorney's unauthorized disclosure of a confidential communication does not eliminate the privilege, the client may renounce or waive the privilege at his pleasure, and when he does so the attorney is bound to answer."
81 Am.Jur.2d, Witnesses § 223.
When the psychologist-client privilege is interpreted in light of the attorney-client privilege, it is clear that the legislature intended the psychologist-client privilege to benefit the client, not the psychologist. Thus, while either the client or the psychologist, on the client's behalf, may assert the privilege, only the client may waive the privilege.
Although the question before us has not been specifically addressed, it has been answered indirectly. In several cases, this court, as well as the Alabama Supreme Court, has held that a criminal defendant impliedly waives the psychologist-client privilege when he actively pursues an insanity defense and presents evidence of his insanity. See Magwood v. State,426 So.2d 918 (Ala.Cr.App. 1982), affirmed, 426 So.2d 929 (Ala. 1983); Ex parte Day, 378 So.2d 1159 (Ala. 1979); Salmon v.State, 460 So.2d 334 (Ala.Cr.App. 1984). No mention is made in these cases of any requirement that the psychologist must also waive the privilege.
There is no doubt that the appellant waived the psychologist-client privilege in this cause. Her waiver was all that was here necessary. The trial court's ruling that both sides must waive the privilege at issue was reversible error.
"If the court erroneously recognizes an asserted privilege and excludes proferred testimony on this ground, of course the tendering party has been injured. . . ." McCormick,Evidence, § 73.1 (1984).
Therefore, we must reverse and remand this cause due to the trial court's erroneous ruling.
 II
The appellant also contends that the trial court erroneously refused to allow the disclosure of information, pertaining to her, contained in the records of the East Alabama Mental Health Center. Section 22-50-62, Code of Alabama 1975 states:
 "No employee of any of the facilities under the management, control, supervision or affiliated with the Alabama mental health board shall be required to disclose any record, report, case history, memorandum or other information, oral or written, which may have been acquired, made or compiled in attending or treating any patient of said facilities in a professional character, when such information was necessary in order to evaluate or treat said patient or to do any act for him in a professional capacity, unless a court of competent jurisdiction shall order disclosure for the promotion of justice; provided, that where a person is a defendant in a criminal case and a mental examination of such defendant has been ordered by the court, the results of the report of such mental examination shall be forwarded to the clerk of said court and to the district attorney and to the attorney of record for the defendant."
The purpose of this statute is to "protect the individuals involved." Ala. Code, § 22-50-60 (1975). Thus, it seems apparent to *Page 345 
this court that the individuals sought to be protected by the legislature (i.e., mental health patients) can waive the protection afforded them by § 22-50-62.
The appellant here signed a release concerning the records of the East Alabama Mental Health Center which pertained to her. She sought to use the information in these records to support her defense of insanity. Although the appellant was not allowed to use the records in her defense, the trial judge allowed the State to introduce information from these records concerning medications which had been administered to the appellant.
Certainly, under these facts, the trial judge should have, for the promotion of justice, allowed defense counsel to use the information contained in the records of the East Alabama Mental Health Center. The records were relevant to the appellant's insanity defense. Both sides, the State and the defense, were entitled to use the information in the records, once the appellant gave her permission and waived the privilege.
 III
Lastly, we must address one additional issue, the sufficiency of the evidence. The appellant here was convicted of murder under § 13A-6-2(a)(2).[3] It is undisputed that this killing was accidental and not intentional.
 "Under Alabama law an accidental killing may support a conviction for murder, manslaughter, or negligent homicide, depending on the circumstances of the case. An accidental death may constitute murder if, '[u]nder circumstances manifesting extreme indifference to human life, [the defendant] recklessly engages in conduct which creates a grave risk of death' to the victim and thereby causes the victim's death. Section 13A-6-2(a)(2); Code 1975. On the other hand, if the defendant's conduct in bringing about the victim's death is simply 'reckless,' the defendant is guilty of manslaughter. Section 13A-6-3(a)(1). If the death results from 'criminal negligence,' the defendant is guilty of criminal negligent homicide. Section 13A-6-4(a).
 "Alabama's homicide statutes were derived from the Model Penal Code. In providing that homicide committed 'recklessly under circumstances manifesting extreme indifference to human life' constitutes murder, the drafters of the model code were attempting to define a degree of recklessness 'that cannot be fairly distinguished from homicides committed purposely or knowingly.' Model Penal Code and Commentaries, § 210.02, Comment, 4 (1980). That standard was designed to encompass the category of murder traditionally referred to as 'de-prayed heart' or 'universal malice' killings. Examples of such acts include shooting into an occupied house or into a moving automobile or piloting a speedboat through a group of swimmers. See LaFave Scott, Criminal Law, § 70 (1972).
 "Recklessly causing another's death may give rise to the lesser included offense of manslaughter. A defendant who recklessly causes another's death commits manslaughter if he 'consciously disregard[ed] a substantial and unjustifiable risk that his conduct would cause that result.' Model Penal Code and Commentaries, § 210.03, Comment 4 (1980). The difference between the circumstances which will support a murder conviction and the degree of risk contemplated by the manslaughter statute is one of degree, not kind. From a comparison of Section 210.03 and 210.02 of the Model Code, it appears that the degree of recklessness which will support a manslaughter conviction involves a circumstance which is a 'gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation,' but is not so high that it cannot be 'fairly distinguished from' the mental state required in intentional homicides. *Page 346 
Compare Comment 4 to § 210.02 with Comment 4 to § 210.03.
 "If the homicide is brought about by 'criminal negligence,' the defendant is guilty of criminally negligent homicide. The essential difference between 'recklessness,' as that term is used in the murder and manslaughter statutes, and 'criminal negligence' is that a reckless defendant is one who has 'consciously disregarded' a substantial and unjustifiable risk, whereas a negligent actor needs only to disregard a risk of which he 'should have been aware.' Model Penal Code and Commentaries § 210.04, Comment 1."
Ex parte Weems, 463 So.2d 170, 172 (Ala. 1984). (Footnote omitted.)
The Alabama Supreme Court has stated that to constitute universal malice murder,[4] "there must be a determination on the part of the defendant 'to take life' without knowing or caring who the victim may be." Napier v. State, 357 So.2d 1011, 1013
(Ala. 1978).
 "Justice Stone, in Mitchell v. State, 60 Ala. 26
(1877), stated:
 " '. . . the legislature, in this [fourth] clause, intended to raise to the high grade of murder in the first degree those homicides which are the result of what is called "universal malice." By universal malice, we do not mean a malicious purpose to take the life of all persons. It is that depravity of the human heart, which determines to take life upon slight or insufficient provocation, without knowing or caring who may be the victim.' 60 Ala. at 30. (Emphasis added.)
 "The word 'determines' presupposes that some mental operation has taken place; the reasoning faculty must be called into play. State v. Massey, 20 Ala. App. 56, 100 So. 625 (1924). See also Curlette v. State, 25 Ala. App. 179, 142 So. 775
(1932).
 'If one knowingly and consciously drives a high-powered automobile . . at an excessive rate of speed into a railroad train moving over a street crossing, knowing that the train is moving over the crossing, and that the automobile will strike the train, and that death will probably result to one or more occupants of the car, although without any preconceived purpose to deprive any particular person of life, but with a reckless disregard of human life, and death results from such act, the driver of the automobile may be guilty of murder in the first degree under the fourth division . . If he did not know that he was driving the automobile into the train, and he did not determine to drive it into the train regardless of consequences, but if the act of so driving it was purely accidental, but while in the commission of an unlawful act, such as driving along a public highway at a reckless rate of speed, or exceeding the speed limit, the offense would be manslaughter.' 20 Ala. App. at 58, 100 So. at 627. (Emphasis added.)
 "See also Jackson v. State, 239 Ala. 38, 40, 193 So. 417 (1940); Mitchell, supra; Blashfield, Cyclopedia of Automobile Law and Practice, § 5378 (1950); and Huddy, Cyclopedia of Automobile Law, 'Criminal Offenses,' § 35 (9th Ed., 1931)."
Langford v. State, 354 So.2d 313, 315 (Ala. 1977).
Certainly, the appellant's conduct, which resulted in the victim's tragic death, is evidence of a high degree of recklessness. This degree of recklessness can, "however, be distinguished from the extreme indifference to human life displayed by a person who commits an intentional homicide."Weems, supra, at 173.
 "The textbook examples of universal malice are generally such acts as shooting into an occupied house or driving an automobile into a crowd. State v. Massey, 20 Ala. App. 56, 100 So. 625
(1924). In each instance, the defendant's act endangers *Page 347 
the lives of many with a high and obvious probability that death or, at least, serious injury would result. In each case, the defendant evinces a culpable mind, determined to act no matter what the consequences to others. He must have determined to follow a course of action which he knows, or should know, will, in all probability, lead to harm to another."
Napier, supra, at 1014.
In the case at bar, the appellant determined to pass the bus in the left hand lane while she was in a no passing zone. There is no evidence that she determined to hit the victim; nor is there any evidence that she realized the likelihood of hitting this victim or any other; and the consequent loss of the victim's life; and proceeded in the face of such probabilities.Langford, supra.
Without evidence to this effect, the appellant's conduct does not constitute murder under § 13A-6-2(a)(2). The facts of this case will not support a murder conviction. Thus, double jeopardy prevents this appellant from being retried for the offense of murder, (authorities cited).
This appellant can, however, be retried on the lesser included offenses of manslaughter and criminally negligent homicide. The jury was charged on these offenses and these offenses are supported by the evidence in this cause. Ex parteBeverly, 497 So.2d 519 (Ala. 1986).
For the reasons shown, this cause is reversed and remanded for a new trial.
REVERSED AND REMANDED.
All the Judges concur.
[1] "For the purpose of this chapter, the confidential relations and communications between licensed psychologists and licensed psychiatrists and clients are placed upon the same basis as those provided by law between attorney and client, and nothing in this chapter shall be construed to require any such privileged communication to be disclosed."
[2] "No attorney or his clerk shall be competent or compelled to testify in any court in this state for or against the client as to any matter or thing, knowledge of which may have been acquired from the client, or as to advice or counsel to the client given by virtue of the relation as attorney or given by reason of anticipated employment as attorney unless called totestify by the client, but shall be competent to testify, for or against the client, as to any matter or thing the knowledge of which may have been acquired in any other manner. (Emphasis added.)
[3] The trial court charged the jury on murder, manslaughter, and criminally negligent homicide.
[4] Prior to the present Code, universal malice murder was one of the classifications for murder in the first degree.