The appellant, Brent Purvis Weaver, was indicted and convicted for the offense of first degree assault, as proscribed by § 13A-6-20(a)(3), Code of Alabama 1975. He was sentenced to 16 years' imprisonment and was ordered to pay $25 victims' compensation assessment, court costs, and restitution of $5,026.47. *Page 537 
The prosecution's evidence tended to show the following: At approximately 3:00 p.m. on Sunday, December 4, 1988, a "pretty day," Billie Parsons was driving her 1986 Chevrolet Blazer vehicle east on Moffat Road, a four-lane highway. Her vehicle was travelling in the right-hand lane when she saw an oncoming Ford Pinto automobile swerve toward her. The Pinto had been travelling west on Moffat Road in the far lane, and Parsons saw no other vehicle in the area when the Pinto started skidding. After the Pinto collided with Parsons's vehicle, Parsons lost consciousness. When she regained consciousness, she saw the appellant standing in front of her car and heard him speaking loudly and "using real bad language."
As a result of the accident, Parsons was hospitalized four days. She was treated for numerous facial lacerations, including a two-inch laceration to the right upper eyelid, and for fractures of the bone surrounding the right orbit and the bone holding the eyeball in the eye socket. She also received bruises; two teeth were damaged; her jaw was misaligned; and she had no feeling in her face. Her eye injuries required an operation to restore and maintain complete eyesight, and at the time of trial, she was anticipating two more operations.
Parsons testified that, when she saw the appellant's car start skidding, she saw no other vehicle in the area; that, prior to the appellant's car's skidding, nothing called her attention to the car; and that she was never face-to-face with the appellant.
John Matthews testified that, as he was driving his automobile in the right lane of the westbound lane of Moffat Road, the appellant's vehicle passed him in the left lane; that, after the appellant's car pulled back into the right lane, the appellant's car started swerving and fishtailing; that the car then crossed the median into the eastbound lane; that he saw no vehicle interfere with the appellant's vehicle before it crossed the median; and that he noticed no reason why the car should have been swerving. He also testified that the speed limit in that area was 45 miles per hour; that he was driving between 40 and 45 miles per hour; and that he could state only that the appellant's car was travelling faster than he was. Matthews further stated that, when the appellant's car passed his, the appellant's car pulled back into the right lane because other cars were ahead in the left lane. Matthews testified that, after stopping at the scene of the accident, he saw the appellant standing in the road by his car, but that he did not approach him and that he did not hear the appellant say anything.
Pearl Matthews, John Matthews's wife, testified that, in her opinion, the appellant's vehicle was travelling over 50 miles per hour and that, when she observed the appellant after the accident, he "seemed to be enraged, upset," but that she could not hear what he was saying. Mrs. Matthews also testified that she did not see any apparent cause for the appellant's vehicle's skidding across the road other than his jerking the wheel as he returned to the right lane after passing their car; that the car just ahead of them and in the left lane was travelling "around" the speed limit; and that the appellant lost control of his vehicle as soon as he steered in front of the Matthews's vehicle.
Trey Oliver, who at the time was traffic accident investigator with the Mobile Police Department, testified that his investigation of the accident revealed the following: the roadway where the accident occurred is a four-lane straight-away with one center turn lane; the minimum speed of the appellant's vehicle prior to impact (the speed of the vehicle to leave the skid marks) was 46.5 miles per hour; and a conservative estimate of the minimum speed that the appellant's vehicle, prior to the skidding and "lock up," was travelling was 50.6 miles per hour. In regard to this last figure, Oliver explained that this speed was based, in part, on the assumption that the victim's vehicle was travelling between 25 and 35 miles per hour; that if he had assumed that the victim had been driving faster, then the estimated speed of the appellant's vehicle would be greater; and, conversely, if he had assumed that she had been driving slower, then the estimated speed of the appellant's vehicle would have *Page 538 
been slower. (There was no testimony as to the speed of the victim's vehicle; however, Oliver testified that there was no physical evidence to indicate that the victim had applied her brakes and that he did not talk to her.) However, he further stated that, in his opinion, the appellant's actual speed probably exceeded 50.6 miles per hour, but that the 50.6 miles per hour figure was the figure that could be scientifically proven. Oliver further stated that, on December 14, he interviewed the appellant, who told him that a blue truck had swerved in front of him; that when he applied his brakes, they locked and he "slid" across three lanes and hit the victim's vehicle; that he was driving about 40 miles per hour; and that the last time he had had anything to drink prior to the accident was on Saturday night. Oliver also explained that, based on the theory that another vehicle, slightly ahead of the appellant, had pulled into the appellant's lane, the skid marks "could indicate evasive action steering the vehicle would go in."
Opey Martin, an emergency medical technician who rendered aid at the scene, testified that the appellant was not very stable and could not stand by himself; that he initially would not stay on the stretcher; that he was "becoming somewhat combative"; that he was trying to fight the medical personnel; that he was using "very vulgar language" toward them and the police officers; and that he had a small laceration to his right temporal region. Martin further described the appellant as follows:
 "Very belligerent, very vulgar. He smelled very strongly of alcohol. Very strongly. His speech was slurred. The tone of his voice was very loud. He couldn't focus on anything. I would ask him one question and he would babble off about something else. He would answer to questions that I specifically would ask him. . . . As we went into the emergency room he acted or . . . passed out, semi-conscious. . . . Very limp. He closed his eyes. He wouldn't say anything. . . . I performed . . . a sternum rub on a patient. He responded to that sternum rub, he wiggled, which usually if a person responds, they are not unconscious. [After the appellant was taken to a room,] he became very combative again. [H]e laid down and calmed down after they threatened to tie him down to a stretcher. . . ."
Martin also stated that he "thoroughly believe[d the appellant] was intoxicated" and that the appellant was intoxicated to the point that he could not safely operate a motor vehicle. However, he stated that when he asked the appellant if he had had anything to drink, the appellant responded, "I haven't had a damn thing to drink." On cross-examination, Martin explained that the appellant had no symptoms indicating that he was in shock.
Robert Philips, Jr., a fire department paramedic who rendered aid to the appellant at the scene, also testified that the appellant was very verbal, was using abusive language, and had a "very strong odor of alcohol." He also stated that the appellant refused several times to allow the paramedics to look at the small cut on his head and that, until he had a discussion with the police, he refused to go to the hospital. Finally, Philips concluded that the appellant was under the influence of alcohol, but he could not give an opinion on whether the appellant was under the influence to the extent that he could not safely operate a motor vehicle.
Lonnie Parsons, the victim's husband and a deputy sheriff, testified that, after he arrived at the scene, he approached the appellant, who responded with a lot of profanity and who smelled of alcohol. He also stated that he had to catch the appellant to keep him from falling when the appellant leaned toward Parsons while the appellant was seated in the back of a patrol car.
Officer Leslie Kohn testified that he was the first police officer on the scene; that the appellant was disorderly, so he put him in the patrol car; that, in his opinion, the appellant was "highly intoxicated"; that he smelled alcohol, which was not stale, five feet away from him; and that, upon inquiry, the appellant stated that he had had only two beers. *Page 539 
Officer J.R. Rawles testified that, in filling out an accident report, she had no problem in getting information from the appellant.
Carl Anthony Boutwell, an emergency room nurse, testified that, after the appellant was in the emergency room for approximately five minutes, he became agitated and combative, removed himself from a cervical collar and immobilization device, and left the hospital, despite the attempts of the hospital personnel to talk to him.
On the appellant's behalf, the appellant's roommate's girlfriend testified that, between 10:15 a.m. and 2:15 p.m. on the day of the accident, she was with the appellant and that he did not appear to be intoxicated. The appellant's stepmother also testified that, when she talked by telephone with the appellant at approximately 1:00 p.m. and when she saw him about 4:30 p.m. after the accident, he was not intoxicated. These two witnesses also testified that the appellant had told them that he lost control of his vehicle when, attempting to avoid a blue Chevrolet El Camino truck that was swerving toward him, he hit the curb. The appellant's testimony was the same. He further explained that he smelled of alcohol because he had consumed 15 cups of draft beer before 11:00 p.m. the previous evening.
As state's rebuttal, Pearl Matthews testified that the appellant swerved in front of her car, after passing it, to avoid hitting a vehicle in the left lane and that that vehicle did not swerve in front of him and that it was not an El Camino.
 I
During Nurse Boutwell's testimony, the trial court, over the appellant's objection, allowed into evidence the appellant's emergency room record. On voir dire examination, Boutwell testified that the record contained notations by someone unknown to him, most likely an intern or a student physician. One of these notations is the following: "23 y/o [year old] o-
[male] involved in MVA large amount of ethanol associated." Boutwell explained, to the jury, that "MVA" is an abbreviation for motor vehicle accident and that ethanol is alcohol. Following the first sentence and in seemingly the same handwriting is a notation to the effect that the patient complained of neck pain and stomach pain. The hospital record further reflects that an ethanol test had been ordered. The appellant now argues that, by the admission of the hospital record containing the hearsay statement that he had been involved in a motor vehicle accident with a large amount of alcohol associated, he was denied "his constitutional right to be confronted by witnesses and his statutory right to cross-examine them." (Appellant's Brief, p. 25.) He relies uponArthers v. State, 459 So.2d 972 (Ala.Cr.App. 1984), andWhetstone v. State, 407 So.2d 854 (Ala.Cr.App. 1981).
The following excerpt, from the record, shows the appellant's objection to the introduction of the hospital record:
 "MR. RIVERS [defense counsel]: Your Honor, I would object. He didn't prepare this report. If you will look at it, part of the report is not prepared by him and I think it would be prejudicial to put it in because nobody can authenticate the writing that's on it. . . .
". . . .
 "THE COURT: . . . . The records seem to be subpoenaed pursuant to the statute and accordingly seem to be authenticated under the statute.
 "MR. RIVERS: Your Honor, he said he could not testify who put that in there.
"THE COURT: He doesn't have to under the statute.
". . . .
 "MR. RIVERS: . . . . He did not know he put it on there. He doesn't know when it was put on. He said he thought an intern put it on there. This is extremely prejudicial to the defendant.
 "THE COURT: All right. Do you have any ground relating to the subpoena?
"MR. RIVERS: No, Your Honor.
 "THE COURT: All right. Then mark the exhibit 12 as evidence."
The appellant's specific grounds for objecting were that part of the record had not *Page 540 
been prepared by the witness, that the writing could not be authenticated, and that the witness does not know by whom or when the notation was made.
We do not consider these specific grounds to have alerted the trial court to the ground now asserted — the denial of the right to confrontation — and we will not allow the appellant to now so expand his argument. "The trial court must be apprised of the basis for the objection with sufficient particularity to allow an informed decision to be made on theparticular legal issue involved." Bland v. State,395 So.2d 164, 168 (Ala.Cr.App. 1981) (emphasis added). "[A]n appellant is limited to those grounds raised at trial and may not expand them upon appeal." Yates v. State, 390 So.2d 32, 34
(Ala.Cr.App. 1980). "The trial court cannot be placed in error on grounds not asserted, and those not asserted are waived."Jackson v. State, 553 So.2d 647, 650 (Ala.Cr.App. 1989).
In Ex parte Frith, 526 So.2d 880, 882 (Ala. 1987), our supreme court ruled that an objection to the admission of a letter, wherein a hospital psychiatrist set out his opinion of the appellant's mental condition on the ground that the proper foundation had not been laid for its admission as a business record, did not preserve the issue of whether the admission of the letter deprived the appellant of his right to cross-examine witnesses against him. The court, in so holding, stated, "The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial," id.
As noted by the court in Whetstone v. State,407 So.2d at 861, a case upon which the appellant relies, "an accused mayproperly object and have excluded any portion of a copy of his hospital records where the information to which he objects would be inadmissible under general rules of evidence." Even if we considered the appellant's objection to have alerted the trial court to the argument that the specific notation was inadmissible hearsay, which we do find to be an unreasonable conclusion, a hearsay objection does not encompass the denial-of-confrontation ground. See D. Binder, Hearsay Handbook
§ 6.01 (2d ed. 1983) (wherein it is recognized that the denial of a defendant's constitutional right to confrontation is a separate objection, that the hearsay exclusion is backed up by a separate exclusion based on the Confrontation Clause[1]). InCalifornia v. Green, 399 U.S. 149, 155-56, 90 S.Ct. 1930,1933-34, 26 L.Ed.2d 489 (1970), the Court noted the following:
 "While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. See Barber v. Page, 390 U.S. 719
[88 S.Ct. 1318, 20 L.Ed.2d 255] (1968); Pointer v. Texas, 380 U.S. 400 [85 S.Ct. 1065, 13 L.Ed.2d 923] (1965). The converse is equally true; merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied. [Footnote omitted.]"
We note one final procedural bar to our review of the appellant's argument: the trial court was not requested to delete or exclude the contested statement from the remainder of the report. While in his brief the appellant complains of only a portion of the hospital record, at trial he asked only that the entire report not be admitted. "When a party objects to a document as a unit that contains admissible as well as *Page 541 
inadmissible matter, the trial court is justified in overruling the objection." Smith v. State, 354 So.2d 1167, 1172
(Ala.Cr.App. 1977), cert. denied, 354 So.2d 1172 (Ala. 1978).
Even assuming that the appellant's denial-of-confrontation argument was preserved, we believe that any error the trial court may have committed in this respect was harmless (and, thus, we decline to decide if the admission of the contested notation violated the Confrontation Clause). The contested statement in the hospital record — "large amount of ethanol associated" — was certainly cumulative in nature, especially to the testimony of Martin, the emergency medical technician; Philips, the fire department paramedic; and Kohn, a police officer. See Holland v. State, 424 So.2d 1387, 1390
(Ala.Cr.App. 1982). In Estes v. State, 358 So.2d 1050, 1054
(Ala.Cr.App. 1977), cert. denied, 358 So.2d 1057 (Ala. 1978), in discussing the lack of prejudice in the assumingly erroneous admission of a 0.27 percent photoelectric intoximeter (PEI) test result in a second degree murder prosecution, the court stated the following:
 "The admission of evidence apparently illegal may be rendered prejudicially innocuous by subsequent legal testimony to the same effect or from which the same facts can be inferred. Yelton v. State, 294 Ala. 340, 317 So.2d 331 (1974); 7 Alabama Digest, Criminal Law [key] 1169.2(1). The ultimate fact to be inferred here is intoxication or drunkenness. Before the results of the PEI test were admitted there was a staggering and overwhelming amount of evidence that the appellant was drunk and highly intoxicated. It is not error to allow facts to be shown over objection when they have already been proved without objection. Bush v. State, 282 Ala. 134, 209 So.2d 416 (1968). Though Patton v. City of Decatur, Ala., 337 So.2d 321 at 324 (1976), held that the results of a PEI test are prejudicial, it is not binding in this instance because in Patton there was no independent proof of intoxication apart from the test itself.
 "In Holloway v. City of Birmingham, 56 Ala. App. 545, 323 So.2d 726 (1975), this court refused to even consider the assertion of the defendant that the city failed to lay a proper predicate prior to the admission of an intoximeter test because the court was firmly of the opinion that the defendant's intoxicated condition at the time of the accident was fully proved by the testimony of two police officers who observed the accident and talked to the defendant immediately afterward. In Weaver v. City of Birminghan, Ala.Cr.App., 340 So.2d 99, 102 (1976), this court rejected this position under the particular facts because the evidence of intoxication was not as strong. However in this case the evidence of intoxication is so extensive and comprehensive that any other conclusion requires a forced and strained construction, if not utter disregard of the facts. Moreover, the summary rejection of the reasoning exercised in Holloway renders that case a legal anomaly and raises serious questions about the absence of continuity in the application of legal doctrine by this court."[2]
While we admit that the present testimony supporting a conclusion that the appellant was intoxicated is not as "staggering and overwhelming" as that in Estes, we find it clearly to be sufficient to render the notation in the emergency room report inoffensive and innocuous. See alsoPowell v. State, 515 So.2d 140, 143-44 (Ala.Cr.App. 1986).
The contested notation certainly does not have the damaging or persuasive impact that the scientific and definite result of a blood alcohol level test does. See Ex parte Curtis,502 So.2d 833, 835 (Ala. 1986) (wherein the court, in refusing to hold, as *Page 542 
harmless, the admission of PEI test results, recognized "the great weight often given to results from sophisticated, technical machinery"). Moreover, the contested notation does not have the legal effect of a test result showing a blood alcohol level exceeding 0.10 percent: i.e., presenting a legal presumption of intoxication, § 32-5A-194(b)(3). Unlike the evidence of the chemical test of the defendant's blood showing a blood alcohol level of 0.22 percent in Miller v. State,484 So.2d 1203, 1205 (Ala.Cr.App. 1986), the instant notation was not "quite simply, 'devastating,' " even though here, as inMiller, "the degree and extent of the defendant's intoxication . . . was highly relevant and influential in the jury's determination," id. Compare also Ex parte Curtis (wherein the court held that the admission of the PEI test results was not harmless where the evidence was conflicting and the only other testimony indicating the defendant's intoxication was that of the arresting officer to the effect that he had twice observed the defendant's vehicle cross the yellow line; that the defendant's breath smelled of alcohol, his eyes were red, and his speech was slurred; and that he "felt" like the defendant was under the influence); Whetstone v. State, 407 So.2d 854,860, 862 (Ala.Cr.App. 1981) (wherein the court held that the admission of the fact that the defendant's blood alcohol level was 0.23 percent was not harmless since the retired director of forensic sciences testified "in great detail as to how one laboring under a 0.23% blood alcohol level would function" and "[t]he results . . . played an extremely important part in the State's burden of proving the requisite degree of reckless conduct"); Webb v. State, 378 So.2d 756, 757 (Ala.Cr.App.),cert. denied, 378 So.2d 758 (Ala. 1979) (wherein the court noted that, particularly in light of the facts that the prosecution's witness who was riding in the vehicle with the defendant at the time of the homicide would not testify that the defendant was intoxicated and that the test result raised a legal presumption that the defendant was intoxicated, the evidence was insufficient to reduce the admission of the chemical blood test result to the degree of error that could be considered harmless).
The appellant's intoxication was overwhelmingly proved by evidence other than the notation in the emergency room record. Although the evidence of intoxication was conflicting and the appellant's intoxication was a critical issue, we cannot find that, taking the evidence as a whole, the introduction of the notation might have influenced the jury in arriving at its verdict. See Wilson v. State, 520 So.2d 205, 206 (Ala.Cr.App. 1987) (wherein the court noted that "[t]he standard . . . for reviewing the introduction of illegal evidence is not whether the evidence did influence the jury, but whether it might have influenced the jury in arriving at the verdict") (quoting Exparte Ward, 497 So.2d 575, 576 (Ala. 1986)). In so holding, we reject the appellant's argument that, because the notation was most likely made by an intern or student physician, the jury gave more weight to it than to the testimony of the "lay witnesses." We certainly consider the emergency medical technician, the fire department paramedic, and the police officer to be experts, rather than lay witnesses, on the question of intoxication, for "they could certainly enlighten the jury on the subject of intoxication more than the average man on the street," Sanders v. City of Birmingham,542 So.2d 325, 330 (Ala.Cr.App. 1988) (holding that the trial court correctly characterized police officers as experts on the question of the defendant's intoxication).
In conclusion, we find that, in view of the testimony presented, the admission of the contested notation, if error, was harmless beyond a reasonable doubt. "[A]fter an examination of the entire cause," we cannot say that "the error complained of has probably injuriously affected substantial rights of the [appellant]," A.R.App.P. 45.
 II
The appellant contends that the trial court erred in denying his motion for judgment of acquittal, made at the close of the prosecution's case-in-chief, because, while the prosecution's evidence certainly established a high degree of recklessness, it allegedly did not establish that he had "determined *Page 543 
to act no matter what the consequences to others," (Appellant's Brief, p. 34) (quoting Watson v. State, 504 So.2d 339, 347
(Ala.Cr.App. 1986), cert. denied, 504 So.2d 339 (Ala. 1987) (emphasis added in brief)). In other words, the prosecution allegedly failed to show that, by "a specific mentaloperation," he "consciously decide[d] to act." (Appellant's Brief, p. 33) (emphasis in brief).
We reject the attorney general's sole counterargument to this issue; this issue was clearly preserved by the appellant's motion for a directed verdict of acquittal entered at the end of the prosecution's case and also by his written motion. SeeEx parte Maxwell, 439 So.2d 715, 717 (Ala. 1983). Thus, we turn to the merits of the appellant's claim.
The appellant was charged under § 13A-6-20(a)(3), Code of Alabama 1975, which provides as follows:
 "(a) A person commits the crime of assault in the first degree if:
". . . .
 "(3) Under circumstances manifesting extreme indifference to the value of human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to any person. . . ."
As the appellant correctly asserts, this crime is analogous to universal malice murder, § 13A-6-2(a)(2),[3] the only real distinction being the degree of injury: murder obviously requiring death and first degree assault requiring serious physical injury. See Commentary, §§ 13A-6-20 through 13A-6-22. Accordingly, we consider the special character of the culpability required under § 13A-6-20(a)(3) to be present in the definition of murder under § 13A-6-2(a)(2). See, e.g.,Gholston v. State, 494 So.2d 876, 883 (Ala.Cr.App. 1986). Thus, in discussing the issue before us, we rely on authority discussing universal malice murder, because that authority is also controlling here.
In arguing that, to be guilty of universal malice assault, one must consciously decide to act, heedless of the consequences, the appellant relies primarily on Watson v.State. The defendant in that case, after taking one or two tranquilizers for treatment of her schizophrenic disorder, which tranquilizers could have caused drowsiness or slowed response time, the defendant passed a bus in a no-passing zone on a hill while going 70 miles per hour in a 55-mile-per-hour zone. After passing the bus and beyond the no-passing zone, the defendant's vehicle reached the top of the hill. There, the vehicle hit the victim, who was walking in the other lane and approximately four feet from the edge of the road. In reversing the defendant's conviction, under § 13A-6-2(a)(2), for universal malice murder, the court held that the prosecution produced no evidence that the defendant had "determined" to hit the victim or that she had realized the likelihood of hitting anyone and the consequent loss of life and proceeded in the face of such probabilities. In so holding, the court relied on case law under § 13-1-70, the predecessor to § 13A-6-2(a)(2), which provided, in its fourth clause,
 "Every homicide . . . perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life, is murder in the first degree. . . ."
The Watson court offered the following reasoning for its reversal:
 "The Alabama Supreme Court has stated that to constitute universal malice murder,* 'there must be a determination on the part of the defendant "to take life" without knowing or caring who the *Page 544 
victim may be.' Napier v. State, 357 So.2d 1011, 1013 (Ala. 1978).
 " 'Justice Stone, in Mitchell v. State, 60 Ala. 26
(1877), stated:
 " ' ". . . the legislature, in this [fourth] clause, intended to raise to the high grade of murder in the first degree those homicides which are the result of what is called 'universal malice.' By universal malice, we do not mean a malicious purpose to take the life of all persons. It is that depravity of the human heart, which determines to take life upon slight or insufficient provocation, without knowing or caring who may be the victim." 60 Ala. at 30. (Emphasis added.)
 " 'The word "determines" presupposes that some mental operation has taken place; the reasoning faculty must be called into play. State v. Massey, 20 Ala. App. 56, 100 So. 625 (1924). See also Curlette v. State, 25 Ala. App. 179, 142 So. 775 (1932).
 " ' "If one knowingly and consciously drives a high-powered automobile . . at an excessive rate of speed into a railroad train moving over a street crossing, knowing that the train is moving over the crossing, and that the automobile will strike the train, and that death will probably result to one or more occupants of the car, although without any preconceived purpose to deprive any particular person of life, but with a reckless disregard of human life, and death results from such act, the driver of the automobile may be guilty of murder in the first degree under the fourth division. . If he did not know that he was driving the automobile into the train, and he did not determine to drive it into the train regardless of consequences, but if the act of so driving it was purely accidental, but while in the commission of an unlawful act, such as driving along a public highway at a reckless rate of speed, or exceeding the speed limit, the offense would be manslaughter." 20 Ala. App. at 58, 100 So. at 627. (Emphasis added.)
" '[Citations omitted.]'
 "Langford v. State, 354 So.2d 313, 315 (Ala. 1977)."
504 So.2d at 346. We note that Watson has not been cited or discussed in any subsequent case.
Like the Watson court, we recognize that for an accused to be guilty of universal malice murder under our present statute the killer must have made some determination to take life — must have knowingly and consciously acted in the face of the very high risk that death would occur. This culpability requirement also applies to universal malice assault. This is clear from the definition of "recklessness," which is the culpable mental state specified by § 13A-6-2(a)(2), as well as §13A-6-20(a)(3), and is as follows:
 "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."
§ 13A-2-2(3) (emphasis added).
However, our present Code provides a crucial departure from the general rule recognized in Watson, an exception that theWatson court apparently did not find applicable to the set of facts before it. The present Code's definition of "recklessness" provides, "A person who creates a risk but is unaware thereof solely by reason of voluntary intoxication, as defined in subdivision (e)(2) of section 13A-3-2, acts recklessly with respect thereto."[4] See also § 13A-3-2(b) *Page 545 
(which provides that "[w]hen recklessness establishes an element of an offense and the actor is unaware of a risk because of voluntary intoxication, his unawareness is immaterial in a prosecution for that offense"). Application of this provision is a clear departure from the law governing the crime of universal malice murder under § 13-1-70 and its predecessors,[5] which is illustrated by the following from Statev. Massey, 20 Ala. App. 56, 58, 100 So. 625, 627 (1924), a prosecution under the fourth division of the first degree murder statute:
 "There was testimony that the petitioner was drunk. Voluntary drunkenness does not excuse crime, yet its excessiveness may produce such a mental condition as to render the intoxicated person incapable of forming a specific intent, and, when the intent is of the essence of the crime, drunkenness as affecting the mental state of the accused becomes a proper question for the jury in determining the question of intent. Fonville v. State, 91 Ala. 39, 8 So. 688.
 "The weight of authority sustains the doctrine that evidence of the condition of the accused, though caused by voluntary drunkenness, may be considered by the jury in deciding the question of intent.
 " 'Partial intoxication will not avail to disprove the specific intent; it must be of such character and extent as to render the accused incapable of consciousness that he is committing a crime; incapable of discriminating between right and wrong — stupefaction of the reasoning faculty.' Chatham v. State, 92 Ala. 47, 9 So. 607.
 "Partial intoxication as shown by the evidence in this case will not excuse crime.
 "Judge Stone in Mitchell v. State, 60 Ala. 26, defines 'universal malice' as that 'depravity of the human heart, which determines [italics ours] to take life upon slight or insufficient provocation, without knowing or caring who may be the victim.'
 "One of the definitions of determine is 'to conclude or decide as the result of reasoning.' Webster's New International Dictionary. Some action of the mind therefore is necessary to 'determine' upon a certain course. The reasoning faculty must be brought into play. The same doctrine which permits the jury to consider evidence of voluntary drunkenness in determining the question of intent is applicable in deciding whether or not there was an operation of the accused's mind, a result of the depravity of heart, which determined to take life without sufficient provocation, without knowing or caring who might be the victim, or whether he was knowingly and consciously guilty of doing a grossly negligent act dangerous to the lives of others, 'evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life.' "
In a discussion of whether one who is charged with universal malice murder (or depraved-heart murder, as the commentators phrase it) is guilty of murder if he is not aware of the risk created by his conduct, we note that Alabama, by § 13A-6-2, follows the Model Penal Code in requiring a showing of the accused's subjective state of recklessness. 2 W. LaFave A. Scott, *Page 546 
Jr., Substantive Criminal Law § 7.4 n. 32 (1986). The treatise continues as follows:
 "No doubt most depraved-heart murder cases do not require a determination of the issue of whether the defendant actually was aware of the risk entailed by his conduct; his conduct was very risky and he himself was reasonable enough to know it to be so. It is only the unusual case which raises the issue — whether the defendant is more absent-minded, stupid or intoxicated than the reasonable man.
 "In the unusual case where the defendant is not aware of the risk, which view is preferable, [the view that one should be guilty of depraved-heart murder if a reasonable man would have realized the risk or the view that one should not be guilty of murder unless he was subjectively aware of the risk]? It is a question of how much fault should be required for murder; for one who consciously creates risk is morally a worse person than one who unconsciously does so, though each of the two persons may constitute an equal danger to his fellow man. On balance, it would seem that, to convict of murder, with its drastic penal consequences, subjective realization should be required. One who is too absent-minded or feeble-minded to think of the risk ought not to be held guilty of murder, though it does not follow that he should escape all criminal liability, such as a conviction of manslaughter or of some other crime of negligent homicide.
 "The real difficulty concerns the intoxicated person who conducts himself in a very risky way but, because of his drunkenness, fails to realize it. If his conduct causes death, should he escape murder liability? The person who unconsciously creates risk because he is voluntarily drunk is perhaps morally worse than one who does so because he is sober but mentally deficient. At all events, the cases generally hold that drunkenness does not negative a depraved heart by blotting out consciousness of risk, and the Model Penal Code, which generally requires awareness of the risk for depraved-heart murder (and for recklessness manslaughter), so provides."
Id. at p. 205-06 (footnotes omitted).
The case of Langford v. State, 354 So.2d 313 (Ala. 1977), is cited (in n. 39) by LaFave and Scott as an exception to the majority that holds drunkenness does not negative a depraved heart. However, as we have discussed, those decisions under § 13-1-70 and its predecessors, such as Langford, were governed by the principle that intoxication may negate the mental operation required for universal malice murder and, further, the applicability of that principle under present statutory law has clearly been rejected by our legislature by its definition of "recklessness." Moreover, our present homicide statutes were derived from the Model Penal Code, Ex parte Weems,463 So.2d 170, 172 (Ala. 1984); Commentary, § 13A-6-2. Model Penal Code § 2.08(2), like § 13A-3-2(b), provides that if, because of self-induced intoxication, the accused is unaware of the risk, such unawareness is immaterial.
Accordingly, we adopt the majority view and conclude that, when the evidence establishes voluntary intoxication as defined by § 13A-3-2(e)(2), the prosecution need not establish that the accused's conduct was knowing and conscious in order to present a case of universal malice. Accordingly, the appellant's precise issue is without merit.
In so holding, we acknowledge that some case law interpreting § 13A-6-2(a)(2) has failed to recognize that, with a showing of intoxication, the prosecution need not establish that the defendant was aware of the risk. For example, in Smith v.State, 460 So.2d 343, 346 (Ala.Cr.App. 1984), wherein the court upheld a universal malice murder conviction arising out of an automobile accident caused by the appellant who had a blood alcohol content of .25 percent, the court stated the following:
 "The appellant next contends that it was never proven that he was driving a vehicle with the intent to kill as stated in the indictment. . . . A conviction for murder resulting from a homicide caused by the driving of an automobile is authorized *Page 547 
where there is sufficient evidence to warrant a finding by the jury either that the accused intentionally caused the collision or that he was conscious of his acts, conscious of the impending danger surrounding him, and conscious of the probable results of his acts, and then, with reckless indifference to the probable consequences of his acts, brought about the collision and death of the deceased. Jolly v. State, 395 So.2d 1135
(Ala.Crim.App. 1981). Such a finding was warranted by the evidence in this case."
The magnitude of the burden placed upon the prosecution by theSmith court was entirely unnecessary, as is apparent from the preceding discussion. (However, this has no effect, obviously, on the court's ultimate holding.)[6] See also Lofton v. State,515 So.2d 137 (Ala.Cr.App. 1987) (wherein the court relied upon theSmith language quoted above even though the appellant's blood alcohol content was .21 percent three hours after the accident).
Accordingly, the judgment of the circuit court is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] The Confrontation Clause of the Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ."
[2] In denying the petition for writ of certiorari, five members of the Alabama Supreme Court (four of whom are no longer on the court) stated the following:
 "In denying this writ, we point out that we do not necessarily agree with the Court of Criminal Appeals' holding on 'harmless error.' Nor, do we agree that in Patton v. City of Decatur, 337 So.2d 321 (Ala. 1976), there was no other evidence of intoxication."
358 So.2d at 1058.
[3] This section provides as follows:
"(a) A person commits the crime of murder if:
". . . .
 "(2) Under circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person. . . .
* "Prior to the present code, universal malice murder was one of the classifications for murder in the first degree."
[4] Section 13A-3-2(e)(2) provides as follows:
 " 'Voluntary intoxication' means intoxication caused by substances that the actor knowingly introduced into his body, the tendency of which to cause intoxication he knows or ought to know, unless he introduces them under circumstances that would afford a defense to a charge of crime."
Intoxication is defined by § 13A-3-2(e)(1), as follows: " 'Intoxication' includes a disturbance of mental or physical capacities resulting from the introduction of any substance into the body."
[5] This departure once again illustrates the partial inaccuracy in the following statement found in the Commentary, § 13A-6-2:
 "Section 13A-6-2(a)(2) also retains as murder the recklessly engaging in conduct which creates a grave risk of death under circumstances 'manifesting extreme indifference to human life,' which is different from a positive intent to kill, and which essentially restates existing law. Former § 13-1-70. . . ."
(Emphasis added.) See also Northington v. State,413 So.2d 1169, 1170 (Ala.Cr.App. 1981), cert. quashed, 413 So.2d 1172
(Ala. 1982) (for recognition of another crucial difference between § 13A-6-2(a)(2) and § 13-1-70).
[6] We note another very confusing aspect of cases dealing with §13A-6-2(a)(2): some cases rely on case law reviewing second degree murder convictions rather than first degree (fourth alternative) murder convictions. For example, the Smith court relied solely on particular language from Jolly which specifically pertains to second degree murder under our prior code.